Trevino v. State 
















IN THE
TENTH COURT OF APPEALS
 

No. 10-95-277-CR
No. 10-95-278-CR
No. 10-95-279-CR
No. 10-95-280-CR
No. 10-95-281-CR

        ROBERTO RODRIGUEZ TREVINO,
                                                                                               Appellant
        v.

        THE STATE OF TEXAS,
                                                                                               Appellee
 

From the 40th District Court
Ellis County, Texas
Trial Court # 21530CR, 21531CR, 21532CR, 21533CR & 21534CR
                                                                                                    

O P I N I O N
                                                                                                    

          A jury convicted appellant, Roberto Rodriguez Trevino, of one count of aggravated
sexual assault of a child, four counts of sexual assault of a child, and one count of indecency
with a child. Tex. Penal Code Ann. §§ 21.11, 22.011, 22.021 (Vernon 1994 & Supp.
1997). The jury sentenced him to 20 years' incarceration for each of the sexual assaults and
for the offense of indecency with a child and to life imprisonment on the aggravated sexual
assault. In six points of error, Trevino alleges: (1) the trial court abused its discretion in
denying his motion for change of venue; (2) the trial court abused its discretion in denying his
motion for continuance so that he could undergo psychiatric testing; (3) the trial court erred in
failing to dismiss the jury after a Batson challenge; (4) the trial court erred in failing to grant
his motion for mistrial after the State violated several pretrial motions; (5) the trial court erred
in excluding relevant testimony; and (6) the evidence was factually insufficient to support
Trevino's conviction. We will affirm.
FACTUAL BACKGROUND
          Trevino was arrested on February 9, 1995, for the alleged sexual assaults of five
children which occurred between January 1994 and February 1995. The first report of any
impropriety by Trevino was made by S.H., a 12-year-old female, on August 4, 1994. S.H.
reported that, during the previous night, Trevino had kissed and fondled her breasts and
touched her genital area after she passed out from consuming alcohol provided by Trevino.


 
The second report of sexual misconduct by Trevino was filed on August 23, 1994, by S.L., a
15-year-old male. According to S.L., Trevino allegedly sodomized him on January 17, 1994,
after S.L. passed out from drinking alcohol which Trevino had provided. C.W., a 16-year-old
male, and P.L., an 18-year-old male, both made complaints against Trevino on February 9,
1995. C.W. reported that he had been forced to perform oral sex on and have anal sex with
Trevino on multiple occasions between December 1994 and February 1995 and that Trevino
had threatened him with a gun on one such occasion. In his report against Trevino, P.L.
alleged that he had been sodomized by Trevino and forced to perform oral sex on Trevino
multiple times between March 1994 and February 1995.


 The final complaint against Trevino
was made by S.R., a fifteen-year-old male, on February 17, 1995. S.R. reluctantly told police
that he too had been sodomized by Trevino after having passed out from drinking alcohol
provided by Trevino.
          Upon arrest, Trevino was charged with 2 counts of indecency with a child, 2 counts of
aggravated sexual assault, and 27 counts of sexual assault of a child. A jury found that
Trevino had committed the offense of indecency with a child against S.H., the offense of
aggravated sexual assault against C.W., and the offenses of sexual assault against C.W., S.R.,
S.L., and P.L. Trevino appeals from these convictions. 
FACTUAL SUFFICIENCY
          In his sixth point of error, Trevino argues that the evidence is factually insufficient to
support the judgment. He contends the jury could not have found beyond a reasonable doubt
that he was guilty of the charged offenses because the only evidence presented by the State was
the testimonies of the five complainants. He asserts that, because there were no eyewitnesses
to any of the alleged sexual assaults and because there was no direct evidence to prove any of
the victims had been assaulted, the evidence is not factually sufficient to support his
conviction. We disagree.
          The following evidence was adduced at trial.
                                                   Complainant - S.H.
          At the time Trevino committed the offense, S.H., a 12-year-old female, was having a
sexual relationship with P.L., a 17-year-old male, who spent a great deal of time at Trevino's
house. One day prior to the offense, S.H. went to Trevino's house for the sole purpose of
having sexual intercourse with P.L. The next day, August 3, 1994, S.H. lied to her mother
about spending the night at a female friend's house so she could spend the night with Trevino
and see P.L. the next morning when he came back to Trevino's to go to work. After taking
P.L. home, Trevino and S.H. drove to Reagor Springs to eat dinner. When they returned to
Trevino's house, Trevino fixed S.H. two mixed drinks. After consuming the alcohol, S.H.
vomited several times. S.H. laid down on Trevino's bed in hopes of feeling better. When she
laid down she was wearing a t-shirt and shorts with a swimsuit underneath. S.H. was
awakened by Trevino kissing and fondling her breasts and asking her if she was going to have
sex with him. S.H. was naked, and Trevino touched her genital area with his hand. S.H.
asked Trevino to let her get up, and he complied. She then went into the living room where
she slept, undisturbed, until the next morning when P.L. arrived for work. S.H. told P.L.
what had happened. When S.H. returned home that evening, she was bleeding vaginally. Her
mother took her to the hospital, where S.H. told her mother about having sex with P.L. and
being fondled by Trevino. S.H.'s mother called the police and filed complaints against P.L.
and Trevino.
Complainant - S.L.
          S.L. testified to the following facts. S.L. met Trevino in November 1993 and started
working on Trevino's farm shortly thereafter. As payment for the work, Trevino paid S.L. in
cigarettes, beer, and cash. Trevino sexually assaulted S.L. on January 17, 1994. Trevino
invited S.L. to accompany him and Jim, Trevino's roommate, to a recreational park in Dallas. 
Having his mother's permission, S.L. went to Dallas with Trevino and Jim. On the way to
Dallas, Trevino stopped at a liquor store in Reagor Springs to buy beer, and the threesome
drank beer on their way to Dallas and on the return trip. Once they returned to Trevino's
house, they played "craps" and continued to drink. S.L. became "real drunk" and passed out,
fully clothed, on Trevino's bed. When S.L. woke up, he was naked. S.L. was lying on his
stomach, and Trevino, also naked, was on top of him, penetrating S.L.'s anus with his penis. 
S.L. was in pain and screamed. He tried to physically stop Trevino, but Trevino, weighing
about 400 pounds, was too heavy. S.L. told Trevino to stop; however, Trevino continued
moving until he ejaculated. After getting dressed, S.L. asked Trevino to take him home, and
Trevino complied. During the assault, Jim was passed out in the living room. S.L. did not
immediately tell anyone what had happened because he was embarrassed. He first told his ex-girlfriend's mother, and then in August 1994, he told his counselor who notified the police. At
the time S.L. made his report, he did not know anyone else had been victimized by Trevino. 
S.L. did not go to a doctor but did have an HIV test performed, the results of which were
negative.
Complainant - P.L. 
          P.L. became acquainted with Trevino through his brother, S.L., who was working for
Trevino on Trevino's farm. P.L. also started working on Trevino's farm. After a period of
time, Trevino asked P.L. to spend the night at his house so P.L. could begin work early the
next morning. That night, P.L., Jim, and Trevino got drunk at Trevino's house. P.L. got so
drunk that he passed out. When he awoke, his pants had been removed and Trevino was on
top of his back with his penis penetrating P.L.'s anus. P.L. told Trevino to stop; however,
Trevino continued penetrating P.L. until he ejaculated. P.L. then got dressed and fell back
asleep. This was the first of many times Trevino sexually assaulted P.L.; however, P.L. could
not remember this date or any of the other dates that Trevino assaulted him. 
          P.L. did testify that on some occasions, Trevino would put a blanket or a trash bag
over P.L.'s head or turn off the porch light so that P.L. could enter and leave Trevino's house
without the neighbors being able to identify him.
           P.L. did not tell anyone that Trevino was sexually assaulting him, and he continued to
spend time with Trevino, even moving in with him for a period of time. P.L. maintained his
relationship with Trevino and allowed Trevino to continue to sexually assault him because his
home-life was intolerable and because Trevino convinced P.L. that no one but Trevino cared
for him. Additionally, Trevino provided P.L. with everything he needed in return for sexual
favors. At one point, Trevino was even made "custodian" of P.L. by a court and put in charge
of getting P.L. to school everyday.
          When asked if he knew whether Trevino was having sexual contact with anyone else,
P.L. testified that he had seen C.W. performing oral sex on Trevino in Trevino's truck at the
farm.
          P.L. ended his relationship with Trevino because he got tired of being abused and
because he and his mother began to rebuild their relationship.
Complainant - S.R.
          S.R. first went to Trevino's house in August 1994 to see his friend, P.L. On this first
visit, Trevino took S.R. and P.L. to Reagor Springs to buy beer and to Trevino's farm. S.R.
visited Trevino's house on two other occasions. On the last occasion, S.R., having already
consumed some quantity of beer, went to Trevino's house to see P.L., and Trevino fixed S.R.
mixed drinks. At some point during the evening, Trevino took P.L. home. While Trevino
was gone, S.R. either fell asleep or passed out in a recliner in the living room. When he woke
up, he was lying naked on Trevino's bed with Trevino on top of him. Trevino was also naked
and was penetrating S.R.'s anus with his penis. Trevino continued the assault until he
ejaculated. Afterwards, S.R. got dressed and walked, more than a mile, home. S.R. did not
tell anyone that Trevino had sodomized him because he was ashamed. S.R. admitted that, if
the police had not come to question him about Trevino, he would not have reported the
incident at all.
Complainant - C.W.
             C.W. met Trevino during the winter of 1994 when Trevino and P.L., whom C.W.
knew, stopped to pick him up as he was walking down a road. Trevino and P.L. were on their
way to Waco, and C.W. accompanied them. After returning to Waxahachie from Waco, they
went to Trevino's house where C.W. drank beer and liquor. C.W. began to feel "woozy," and
Trevino fixed him a pallet on the floor in Trevino's bedroom. As C.W. started to fall asleep,
Trevino joined him on the floor and asked C.W. to perform oral sex on him. C.W. complied. 
Trevino then asked C.W. to engage in anal sex. C.W. again complied, and Trevino penetrated
C.W.'s anus with his penis. C.W. did not remember if Trevino ejaculated but did remember
that it was very painful. Afterward, C.W. vomited on the floor. 
          Even after this assault, C.W. continued to visit P.L. at Trevino's house and to work on
Trevino's farm. C.W. did not remember specific dates, but remembered that on several
occasions between January 1995 and February 1995, while helping Trevino get water for the
animals, Trevino would ask C.W. to perform oral sex on him. Though he could not remember
the specific date, C.W. recalled that during an overnight stay at Trevino's, Trevino picked up
a .25 caliber pistol from the table by his bed and said to C.W.: "If you don't suck my dick,
I'm going to shoot you." Afraid of Trevino, C.W. submitted to Trevino's demands,
performing oral sex on him and engaging in anal sex with him.
          C.W. admitted that he continued to go back to Trevino's even after Trevino threatened
him because he wanted to see P.L., whom C.W. thought of as a brother. 
Tony Wintworth, Dick and Erma Alsop



          Three of Trevino's neighbors, Tony Wintworth and Mr. and Mrs. Dick Alsop, all
testified to witnessing the same types of events at Trevino's house. According to Wintworth
and the Alsops, there were young boys visiting Trevino at all hours of the day and night. 
Young boys could be seen drinking beer on Trevino's front porch. Furthermore, at times,
people could be seen entering or exiting with something covering their heads or Trevino would
be seen arriving home and turning off the porch light before rushing his passengers into the
house.
Mohamad Shake
          Shake, a clerk at a convenience store in Reagor Springs, testified that he knew Trevino
because Trevino used to be a regular customer. Furthermore, each time Trevino came into the
store, he would have one or more different young boys with him.
Officer Billie Wiggins
          Billie Wiggins, an officer for the Waxahachie Police Department, testified to the
following facts. Officer Wiggins is one of four investigators for the Waxahachie Police
Department, and she is assigned to all cases involving kidnapping, assaults, sex crimes, and
crimes against children. Officer Wiggins had special training in investigating sex crimes
against children, and in her four years as an officer, she had investigated between 150 and 200
cases. She investigated the charges filed against Trevino. 
          Officer Wiggins took her first report against Trevino from S.H., a 12-year-old female,
on August 4, 1994. S.H.'s mother notified the police that her daughter had been assaulted by
Trevino and had engaged in sexual intercourse with P.L., a 17-year-old. S.H.'s mother filed a
complaint against both Trevino and P.L. The initial report from S.H. and S.H.'s mother was
taken by Officer Joe Wiser, and Officer Wiggins was assigned to the case the following day by
her supervisor, Craig Rudolph. Officer Wiggins took one statement from S.H. which
contained the complaint against Trevino and the complaint against P.L. 
          Neither P.L. nor Trevino was arrested as a result of the complaints made against them
because, according to Officer Wiggins, there was no probable cause to do so. She did,
however, refer both cases to the Ellis County Grand Jury, which did not indict either P.L. or
Trevino.
          The second complaint against Trevino was made on August 23, 1994, by S.L. 
Although S.L. made his initial report to Officer Phil Pruitt, Officer Wiggins investigated the
complaint.
          The next complaints against Trevino were made on February 9, 1995, by C.W. and
P.L. These reports were made to Officer Barry Owens, who was also prepared to take C.W.'s
and P.L.'s statements. However, C.W. and P.L. indicated they would prefer to talk to a
female officer, so Officer Wiggins took the statements. After taking statements from both
C.W. and P.L., Officer Wiggins obtained an arrest warrant for Trevino, who was arrested the
night of February 9, 1995.
          On cross-examination, Officer Wiggins denied that she had not followed up on her
investigation of the complaint filed against P.L. because he had agreed to testify against
Trevino. Officer Wiggins testified that she did not know why the complaint against P.L. had
not been pursued because, after making her referral to the grand jury, the district attorney's
office took over the case. Officer Wiggins further stated that having P.L. file a complaint
against Trevino was not the catalyst for arresting Trevino. Officer Wiggins testified that
Trevino was arrested on February 9, 1995, because, at that time, the Waxahachie Police
Department had received four complaints from children who had been victimized by Trevino.
Dr. Dana Remmer 
           Dr. Dana Remmer, a physician at the Children's Medical Center in Dallas, testified as
an expert witness. Dr. Remmer examined C.W. on February 10, 1995, and found no signs
that C.W. had been sodomized. However, Dr. Remmer explained that, in most instances of
sexual abuse, examinations of the victims are normal. She explained how the anus stretches
easily to allow the passage of large objects and how, if the entry was not violent, there would
not be any signs of sexual abuse after 48 hours. According to Dr. Remmer, the fact that C.W.
had no visible signs of sexual abuse was not conclusive that C.W. had not been sexually
assaulted.
Ricky Tutton
          Tutton, who was 29-years-old at the time of trial, testified that he had known Trevino
for 16 years and that Trevino had never made any sexual advances toward him. However,
when Tutton first met Trevino, Trevino was still living with his family. 
          Tutton, who was a resident at Trevino's house between March 1994 and June 1994,
testified that during the time period when he and his wife and two children were living with
Trevino, there were several young boys, including P.L., who were either frequent visitors or
residents at Trevino's house. At no time did Tutton ever see Trevino act improperly toward
P.L., although Tutton admitted he was not always with P.L. and Trevino.
Joseph Ridgeway
          Joseph Ridgeway, a 29-year-old, testified that he had known Trevino since the age of
12 and that Trevino had never made any sexual advances toward him. However, Ridgeway
also testified that, when he first met Trevino and spent time with him, Trevino was living with
his family and not in his own house.
"Patricia"


 
          "Patricia," the mother of complainants P.L. and S.L., testified her sons had her
permission to spend time with Trevino, helping him on his farm, but that at no time had either
of her sons lived with Trevino. "Patricia" admitted that her son, S.L., had been in counseling
to help him adjust to the fact that he was adopted but that he became hostile only after he
started spending time at Trevino's house. "Patricia" also recalled a strange incident involving
her son, P.L. She recounted that, on one occasion when Trevino brought P.L. home, P.L.
was wearing women's underwear and a bra. After learning that her sons might have been the
victims of sexual abuse, "Patricia" did not take them to see a doctor because she had learned,
from watching television programs, that abuse could not be detected unless it had occurred
immediately prior to the examination.
Application of Clewis
          The proper standard for reviewing the factual-sufficiency of a judgment is whether the
evidence, both for and against the jury's verdict, demonstrates that the conviction is clearly
wrong and unjust. See Clewis v. State, 922 S.W.2d 126, 135 (Tex. Crim. App. 1996). 
Contrary to the proposition advanced by Trevino that, as an appellate court, we are authorized
to reweigh the evidence and disagree with the jury's determinations, this court has held that, in
conducting a factual-sufficiency review of the evidence, we will give due deference to the
jury's assessment of the witnesses' credibility and to its resolution of any conflicts in the
evidence. Desselles v. State, 934 S.W.2d 874, 878 (Tex. App.—Waco 1996, no pet.); see
Jones v. State, No. 72,026, slip op. at 4-5 (Tex. Crim. App. December 18, 1996); Clewis, 922
S.W.2d at 133. We recognize that these are the prerogatives of the jury as a fact-finding body,
and that we may not preempt that role unless the verdict is so contrary to the overwhelming
weight of the evidence as to be clearly wrong and unjust. See Jones, slip op. at 4-5; Clewis,
922 S.W.2d at 135; Hernandez v. State, No. 10-95-325-CR, slip op. at 18 (Tex. App.—Waco,
January 15, 1997, pet. filed). 
          Considering all the evidence, both for and against the verdict, we conclude that the
judgment is factually supported by the record. During the trial, the jury heard the testimonies
of the victims about how Trevino had assaulted them. Trevino contends that the testimonies of
the victims were too vague to convince the jury beyond a reasonable doubt that he committed
the charged offenses. However, we believe that all the evidence presented at trial was
factually sufficient to support a judgment against Trevino. 
          Even though P.L., C.W., and S.R. testified that they could not remember the exact
dates on which Trevino had assaulted them, they all testified that, on at least one occasion,
Trevino assaulted them after having gotten them intoxicated to the point of passing out. The
testimonies of P.L., C.W., and S.R. are consistent with the testimonies of S.H. and S.L. who
remembered the dates on which Trevino assaulted them and testified that he did so after getting
them drunk.  The fact that Trevino would provide alcohol to underage children was
corroborated by Shake and Trevino's neighbors. Shake testified that, as the clerk of the
convenience store in Reagor Springs that Trevino frequented, he would sell Trevino alcohol
and see young people, especially boys, with Trevino. Wintworth and the Alsops also testified
to seeing young people at Trevino's house drinking beer.
          Furthermore, Officer Wiggins explained that, in her experience of investigating
between 150 and 200 cases of sexual assault of children, it was not uncommon for children not
to remember the specifics of their assaults because of the trauma they endured. Officer
Wiggins stated that this was especially true for victims who had endured abuse over a period of
time.
          Trevino maintains that the lack of physical evidence that the victims were assaulted
supports his contention that the evidence is factually insufficient. No physical evidence was
presented to show that any of the victims had been abused. Only one of the victims, C.W.,
was examined by a doctor. The examining physician, Dr. Remmer, testified that there were
no physical signs that C.W. had been sexually abused. However, Dr. Remmer further
explained that it was common in such cases for there to be no physical signs of abuse unless an
examination was conducted within 48 hours of the violation.
          The testimonies of Ridgeway and Tutton, recounting how they first became acquainted
with Trevino when they were teenagers and that Trevino had never made any sexual advances
towards them, does support Trevino's position that he was innocent of any impropriety toward
the complainants. Both Ridgeway and Tutton testified that Trevino was not living in his own
house when they were spending time with him; Trevino was still residing with his family. 
Furthermore, Tutton testified that, even though he and his family lived with Trevino when
some of the assaults against the victims were alleged to have taken place, he was not always
around Trevino when Trevino was with the victims. 
          Considering all the evidence presented at trial and deferring to the jury's resolution of
any conflicting evidence, we conclude that the verdict was not so contrary to the overwhelming
weight of the evidence as to be clearly wrong and unjust. See Jones, slip op. at 4-5; Clewis,
922 S.W.2d at 129; Desselles, 922 S.W.2d at 881. Trevino's sixth point is overruled.
                     MOTION FOR CHANGE OF VENUE
          In his first point of error, Trevino contends the trial court abused its discretion in
denying his motion for change of venue. Trevino alleged that it would be impossible for him
to get a fair trial in Ellis County due to unfavorable media coverage and because local officials
had conspired against him and his family. Trevino's motion was supported by sworn
compurgators Richard C. Hill and Emilio Perez. See Tex. Code Crim. Proc. Ann. art.
31.03(a) (Vernon 1989). However, the State filed a controverting affidavit which put the issue
before the trial court. See id. art. 31.04 (Vernon 1989).
          A trial judge may grant a defendant's motion for a change of venue if the defendant can
show that (1) there exists in the county, where the prosecution is to be held, great prejudice
against the defendant that the defendant cannot obtain a fair and impartial trial or (2) there is a
dangerous combination instigated by influential people against the defendant that no fair trial
can be had. Id. art. 31.03(a). A trial court's decision to deny a defendant's motion for change
of venue will not be reversed on appeal absent an abuse of discretion. Ransom v. State, 920
S.W.2d 288, 299 (Tex. Crim. App. 1996) (on rehearing). The trial court is the sole fact-finder, and its decision will not be disturbed as long as it is reasonably based on the record
before it. Hathorn v. State, 848 S.W.2d 101, 109 (Tex. Crim. App. 1992); Narvaiz v. State,
840 S.W.2d 415, 428 (Tex. Crim. App. 1992); see also Ransom, 920 S.W.2d at 299. 
          A defendant who has moved for a change of venue carries the heavy burden of proving
"the existence of such a prejudice in the community that the likelihood of obtaining a fair and
impartial trial is doubtful." Beets v. State, 767 S.W.2d 711, 743 (Tex. Crim. App. 1987) (on
rehearing). To have venue changed based on pretrial publicity or because of a dangerous
combination of influential people, which would prevent the defendant from receiving a fair and
impartial trial, the defendant must show that prejudice against him actually infiltrated the jury
process. See id.; Lopez v. State, 158 Tex. Crim. 16, 252 S.W.2d 701, 704 (1952).
Change of Venue Hearing 
          At the hearing on Trevino's motion, the defense called Trevino, Billie Joe Ridgeway,
and Trevino's sister, Gloria Trevino Turner. Trevino recounted the numerous problems he
had with both Waxahachie city officials and Ellis County officials. Trevino testified to the
following incidents: (1) Joe Grubbs, prior to becoming district attorney, as the county judge of
Ellis County, had forced Trevino to represent himself on a weapons charge; (2) a county
commissioner accused Trevino of threatening him after the county refused to gravel the road
leading to Trevino's property and because Trevino's property taxes had been raised; (3) the
Waxahachie Police Department made it difficult for Trevino to file a criminal complaint
against the city manager, Bob Sokol


, after Sokol threatened him; and (4) a Waxahachie
municipal judge would not refer Trevino's complaint against Sokol to the justice court because
Sokol was in charge of the judge's pay check. Trevino stated that because of these events he
could not get a fair trial in Ellis County. Trevino also testified that the charges against him
had been on the front page of the Waxahachie Daily Light.
          Turner testified that Trevino could not get a fair trial in Ellis County due to "bad
publicity" and because there was a conspiracy in Ellis County against the Trevino family. 
Turner testified that her filing of a sexual harassment complaint against a supervisor where she
worked and where the then-current mayor of Waxahachie was the plant manager precipitated
the conspiracy. According to Turner, soon after she filed the complaint, her brother, Juan
Trevino was "pistol whipped" by Waxahachie police officers and that she herself was harassed
by an officer on the Waxahachie police force. Turner stated that she was arrested on several
occasions by the Waxahachie Police Department before she moved from Waxahachie to
Houston. Turner stated that her problems with the Waxahachie Police Department followed
her to Houston. According to Turner, while she was living in Houston she was arrested on
"trumped up" charges and that a "posse" was sent to Houston to take her back to Waxahachie. 
Turner also testified that she filed a civil suit against the Federal Bureau of Investigation and
the Houston Police Department for civil rights violations stemming from one of her arrests in
Houston during which she was badly beaten. In conclusion, Turner stated she believed the
complaints filed against the various law enforcement agencies had played a major role in
criminal charges being filed against her brother, Roberto. On cross-examination, Turner
testified that she had not been a resident of Ellis County for over 18 years.
          Ridgeway testified that he was familiar with the case against Trevino because he had
read about it in the local newspaper. He further testified that he did not think Trevino could
get a fair trial in Ellis County because there had "[b]een too much publicity." On cross-examination, Ridgeway stated that he had known the Trevino family for approximately 20
years and that he had discussed the case with them on several occasions. However, with the
exception of other friends of the Trevino family, he had not discussed the case with anyone in
the general public. Furthermore, Ridgeway was not aware of any group of influential people
who were conspiring against the Trevino family.
          The State called Mike Boyd, Roy Elliott, and Ellis County District Clerk Billie Fuller. 
Boyd testified that he was employed by the First State Bank in Italy, Texas. According to
Boyd, he had not heard about the case against Trevino discussed in either his bank, in the cafe
he frequented, or "on the street." Furthermore, he stated that he was not aware of any
conspiracy against the Trevino family.
          Elliott, President of the Midlothian Chamber of Commerce, testified that he travelled
extensively throughout Ellis County and that he had not heard anyone talking about the case
nor had he read about it in any newspaper. He further testified that he did not know of any
conspiracy against the Trevino family. On cross-examination, Elliott admitted that the fact he
had not discussed the case with anyone did not mean that people were unaware of the case.
          Fuller, as the District Clerk for Ellis County, testified that, as of January 1995, there
were 75,176 qualified potential jurors from which a jury could be selected.
Voir Dire
          Fifty-four Ellis County citizens comprised the venire for the Trevino case. After 9
venire members were excused for cause because they admitted to not being able to consider the
full range of punishment if Trevino were found guilty, 45 potential jurors remained. Of those
venire members, 31 venire members knew nothing about the case and only 14 admitted to
having read or heard about the Trevino case. All 14 of these venire members stated that
nothing they knew about the case would prevent them from being impartial jurors. 
          After reviewing the evidence adduced at the hearing on Trevino's motion to change
venue and the statement of facts from the voir dire examination, we conclude that the trial
court could reasonably have found that Trevino could receive a fair and impartial trial in Ellis
County. At the hearing on Trevino's motion to change venue, the only references made to any
pretrial publicity were: (1) Trevino's testimony that there had been inflammatory media
coverage of his case; (2) Turner's general statement about "bad publicity;" and (3) Ridgeway's
testimony that articles about Trevino's case had appeared on the front page of the local paper. 
Furthermore, the venire members who had read about the case admitted that they had no
preconceived notions regarding Trevino's guilt or innocence and that they could serve as
impartial jurors. In regard to Trevino's contention that he could not receive a fair and
impartial trial in Ellis County because of a conspiracy against him and his family, we conclude
that Trevino has failed to show that any prejudice resulting from any alleged conspiracy
actually reached the jury box. Other than the testimony from Trevino and his sister during the
venue hearing, no other witness, not even Ridgeway, one of the defense witnesses, testified to
knowing of the existence of any conspiracy against the Trevino family. Because Trevino has
failed to carry his burden of showing that any prejudice due to pretrial publicity or to any
dangerous combination instigated by influential people against him actually tainted the jury
process, we hold that the trial court did not abuse its discretion in denying Trevino's motion
for change of venue. Trevino's first point of error is overruled.
EXCLUSION OF EVIDENCE
          In his fifth point, Trevino argues the trial court erred in granting the State's motion in
limine excluding the testimonies of Officer Billie Wiggins, Bob Sokol, and Gloria Trevino
Turner because this evidence was relevant to Trevino's defensive theory that influential people
in the city of Waxahachie and Ellis County had conspired to manufacture the charges against
him. When a motion in limine is granted, an offer of the evidence which was the subject of the
motion must be made at trial to preserve a claim of improper exclusion. See Fuller v. State,
827 S.W.2d 919, 929 n.10 (Tex. Crim. App. 1992). Consequently, to preserve error, Trevino
had to offer the evidence covered by the motion in limine before or during trial and have it
included in the record. The Rules of Appellate Procedure mandate that the proponent of
excluded evidence must offer the evidence, outside the presence of the jury, before the charge
is read. Tex. R. App. P. 52(b); Tex. R. Crim. Evid. 103(a)(2); Easterling v. State, 710
S.W.2d 569, 575 (Tex. Crim. App. 1986). 
          Trevino called Officer Wiggins and Bob Sokol to testify. Out of the presence of the
jury, Trevino offered a brief summary of what the testimony of each witness would allegedly
establish, thus sufficiently preserving his complaint that the trial court excluded relevant
evidence for review. See Moosavi v. State, 711 S.W.2d 53, 55-56 (Tex. Crim. App. 1986) (an
informal bill will suffice as an offer of proof when it includes a concise statement of the
defendant's belief of what the testimony would show). Additionally, on October 3, 1995,
Trevino presented a "Bill of Exception" to the trial court, whereby he called Officer Wiggins,
Bob Sokol, and Dick and Erma Alsop.


 However, this offer of evidence was made almost six
weeks after the jury returned a verdict against Trevino and is untimely. See Tex. R. App. P.
52(b) (offer of proof must be made before the charge is read to the jury). Therefore, we will
not consider this untimely offer of proof in determining if the trial court erred in excluding the
testimonies of Officer Wiggins and Bob Sokol.



          We turn now to whether the trial court erred in excluding the testimonies of Officer
Wiggins and Bob Sokol based only on the offers of proof made during the course of the trial. 
During trial, Trevino explained to the trial court, outside the presence of the jury, that the
testimonies of Officer Wiggins and Bob Sokol would prove his theory that a conspiracy against
him and his family existed and that the charges against him had been fabricated in an attempt to
"get rid of him." The basis of Trevino's theory was that, because he and Sokol had a public
confrontation, resulting in Trevino's filing "verbal assault charges" against Sokol, and because
Officer Wiggins and former police chief Ted Garber, who was a personal friend of Sokol,
were lovers, Officers Wiggins had influenced all five complainants to lie about being sexually
assaulted by Trevino. 
          Evidence is relevant if it has any tendency to make the existence of any fact that is of
consequence to the determination of the action more probable or less probable than it would be
without the evidence. Tex. R. Crim. Evid. 401; Moreno v. State, 858 S.W.2d 453, 463 (Tex.
Crim. App. 1993). Relevancy is not an inherent characteristic of an item of evidence but
exists as a relation between an item of evidence and a matter properly provable in the case. 
Montgomery v. State, 810 S.W.2d 372, 375 (Tex. Crim. App. 1991) (on rehearing). 
Furthermore, the evidence itself need not prove or disprove a particular fact to be relevant. Id.
at 376. Evidence is relevant if it merely provides a small nudge toward proving or disproving
some fact of consequence. Id. However, because the admissibility of evidence is left to the
discretion of the trial court, a ruling will not be disturbed on appeal as long as it was within the
zone of reasonable disagreement. See id.; see also Ford v. State, 919 S.W.2d 107, 115 (Tex.
Crim. App. 1996). The Court of Criminal Appeals has explained the function of an appellate
court in reviewing a trial court's determination of whether evidence is relevant. See
Montgomery, 810 S.W.2d at 391. The Court in Montgomery advised:
It is true that Rule 401 defines "relevance," but that definition is necessarily a broad one. 
Whether particular evidence meets the definition will not always be cut and dried. Our
adversarial system assigns that question to the trial judge, on the assumption that he has
the best vantage from which to decide. Determining the relevance of any given item of
evidence to any given lawsuit is not exclusively a function of rule and logic. The trial
court must rely in large part upon its own observations and experiences of the world, as
exemplary of common observation and experience, and reason from there in deciding
whether proffered evidence has "any tendency to make the existence of any fact of
consequence to the determination of the action more probable or less probable than it
would be without the evidence." [Tex. R. Crim. Evid. 401]. The determination of
relevance, vel non, thus depends upon one judge's perception of common experience. 
[Citation omitted]. The process cannot be wholly objectified. Reasonable [persons] may
disagree whether in common experience a particular inference is available. Where there
is room for such disagreement, an appellate court that reverses a trial court's ruling on
relevancy accomplishes nothing more than to substitute its own reasonable perception of
common experience for that of the trial court. The appellate court effectively displaces the
trial court, commandeering a function institutionally assigned elsewhere.
Id.
          We believe the case before us presents such an instance of reasonable people disagreeing
about whether an inference that the accusations against Trevino were fabricated could be drawn
from the proposed "conspiracy" evidence. In this case, Trevino sought to present the excluded
evidence that a conspiracy existed against him in order to support his theory that all five
complainants had been influenced to lie about being sexually assaulted by him. According to
Trevino's offer of proof, had Bob Sokol been allowed to testify, he would have testified that he
harbored great animosity toward Trevino and had even threatened that someone would eventually
"get rid" of Trevino if Trevino did not stop causing problems with the city management. If
Officer Wiggins had testified, she would have testified that she and former police chief, Ted
Garber, were lovers and that because Garber and Sokol were personal friends, she was loyal to
them and did not like Trevino because he had openly campaigned for the resignation of both Sokol
and Garber.
          We do not find these general assertions sufficient to substantiate Trevino's theory that
Officer Wiggins induced all five complainants to falsify their accusations against him. First of all,
even though Sokol admitted that he and Trevino did in fact have a public confrontation at a city
meeting, there is nothing in the record to link Sokol and Officer Wiggins other than Sokol's
position as the city manager for Waxahachie and Officer Wiggins' position as a member of the
Waxahachie Police Department. Furthermore, there was no evidence elicited at the offer of proof
that the complainants had been persuaded to make the accusations against Trevino. In fact, four
of the complainants reported their assaults to other adults before they even spoke with Officer
Wiggins. 
          Because we believe there is room for disagreement between reasonable persons as to
whether an inference that the accusations against Trevino were false can be drawn from the
proposed and actual testimonies of Officer Wiggins and Sokol, we conclude the trial court did not
abuse its discretion in excluding such testimony, and we will not substitute our judgment for that
of the trial court's. Trevino's fifth point is overruled.        
MOTIONS FOR CONTINUANCE AND FOR PSYCHIATRIC TESTING
          In his second point, Trevino alleges the trial court erred in denying his motion for
continuance so that he could undergo psychiatric testing to determine his competency to stand trial. 
However, Trevino's complaint does not comport with the motions he filed with the trial court. 
See Turner v. State, 805 S.W.2d 423, 431 (Tex. Crim. App. 1991). Trevino filed a motion for
continuance requesting that the trial court delay the trial because Trevino's doctor had advised
Trevino to "avoid all stress of any legal issues for another three months." Trevino's motion for
continuance did not ask that the trial court postpone the trial so that Trevino could undergo
psychiatric testing. Trevino did file a "Motion for Psychiatric Testing to Determine Competency,"
and this motion and Trevino's motion for continuance were argued concurrently, with the trial
court denying both. On appeal, Trevino has argued the trial court's denial of his motion for
continuance as if it were inseparable from his motion for psychiatric testing. In fact, the denial
of the two motions are distinctly separate. Even though we are not required to address
multifarious points, in the interest of justice, we will address Trevino's complaints of the trial
court's denial of his motion for continuance and his motion for psychiatric testing. See Tex. R.
App. P. 74(f); see also Sterling v. State, 800 S.W.2d 513, 521 (Tex. Crim. App. 1990).
Motion for Continuance
          The determination of whether to grant a motion for continuance lies within the sound
discretion of the trial court. See Tex. Code Crim. Proc. Ann. art. 29.03 (Vernon 1989); see
also Heiselbetz v. State, 906 S.W.2d 500, 511 (Tex. Crim. App. 1995). All motions for
continuance must be verified by a person having personal knowledge of the facts relied upon for
the continuance. See Tex. Code Crim. Proc. Ann. art. 29.08 (Vernon 1989); see also Montoya
v. State, 810 S.W.2d 160, 176 (Tex. Crim. App. 1989). Trevino's motion for continuance
consisted of his attorney's blanket statement that Trevino's psychiatrist, Dr. Frederick Petty, had
recommended that Trevino "avoid all stress of any legal issues for another three months." A
medical report from Trevino's doctor was attached to the motion; however, neither the motion nor
the doctor's report were sworn.


 When a defendant's motion for continuance is not verified,
nothing is presented for review. See Montoya, 810 S.W.2d at 176. Trevino's complaint regarding
the trial court's denial of his motion for continuance is overruled.
Motion for Psychiatric Testing to Determine Competency
          Trevino filed a "Motion for Psychiatric Testing to Determine Competency." When a
motion for psychiatric testing is filed with the trial court, the evidence presented in support of the
motion must "raise a bona fide doubt in the mind of the trial court as to the defendant's
competence to stand trial before a court ordered psychiatric examination is required." Richardson
v. State, 663 S.W.2d 111, 113 (Tex. App.—Houston [1st Dist.] 1983, no pet.). Trevino's motion
was unsworn and there was no evidence adduced at the hearing on Trevino's motion. 
Consequently, because Trevino failed to present evidence which would raise a bona fide doubt in
the mind of the trial court as to Trevino's competency, the trial court did not abuse its discretion
when it denied Trevino's motion for psychiatric testing. See Green v. State, 682 S.W.2d 271,
290-91 (Tex. Crim. App. 1984) (An unsworn motion requesting a psychiatrist and an unsworn
statement by a defendant's attorney is not sufficient to raise the issue of competency.); Porter v.
State, 623 S.W.2d 374, 380 (Tex. Crim. App. 1981) (The trial court's decision to deny a
defendant's motion for psychiatric testing will not be disturbed absent an abuse of discretion.). 
Trevino's second point of error is overruled. 
 BATSON CHALLENGE
          In his third point, Trevino contends the trial court erred in overruling his motion to strike
the jury panel after the State improperly used two peremptory challenges in violation of Batson
v. Kentucky, 476 U.S. 79, 86, 106 S.Ct. 1712, 1717 (1986). Trevino, who is hispanic, contends
the State impermissibly struck two black venire members solely because of their race. See Powers
v. Ohio, 499 U.S. 400, 416, 111 S.Ct. 1364, 1373 (1991) (the race of a defendant is irrelevant
to a Batson challenge); Cook v. State, 858 S.W.2d 467, 471 (Tex. Crim. App. 1993) (same).
          A Batson inquiry is a three-step process. First, the defendant has the initial burden of
making a prima facie case of racial discrimination, thereby raising a presumption of a Batson
violation. Purkett v. Elem, — U.S. —, 115 S.Ct. 1769, 1770 (1995); Williams v. State, No.
72,128, slip op. at 6 (Tex. Crim. App. December 18, 1996); Harris v. State, 827 S.W.2d 949,
955 (Tex. Crim. App. 1992); Stiles v. State, 927 S.W.2d 723, 726 (Tex. App.—Waco 1996, no
pet.). Second, once the defendant makes a prima facie showing of discrimination, a "Batson
hearing" is held and the burden shifts to the State to present a race-neutral reason for striking the
venire member. Purkett, — U.S. at —, 115 S.Ct. at 1770; Williams, slip op. at 6; Cantu v. State,
842 S.W.2d 667, 668 n.15 (Tex. Crim. App. 1992); Stiles, 927 S.W.2d at 726. At this step, a
reason is deemed race-neutral "so long as no discriminatory intent is inherent in the explanation
given, even if the explanation is fantastic or implausible." Williams, slip op. at 6 (citing Purkett,
— U.S. at —, 115 S.Ct. at 1771). Upon the presentation of a race-neutral reason by the State, the
burden once again shifts, back to the defendant, to rebut the State's race-neutral reason by showing
that the State's reason is merely a pretext for discrimination. Purkett, — U.S. at —, 115 S.Ct.
at 1770-71; Williams, slip op. at 6; Stiles, 927 S.W.2d at 726. It is at this point that the trial court
determines whether the venire members at issue were struck for a race-neutral reason. Purkett,
— U.S. at —, 115 S.Ct. at 1770-71; Williams, slip op. at 6, Stiles, 927 S.W.2d at 726. 
          After Trevino raised his Batson challenge, the trial court found that Trevino had made a
prima facie showing that the State struck Number 23, a black female, and Number 26, a black
male, because of their race. A Batson hearing followed, and the State responded that race was not
a factor in its decision to strike these venire members. The State further asserted that Number 23
was the subject of a double strike. Therefore, because Trevino's striking of Number 23 would
have prevented her from serving on the jury, there is no basis for his complaint that the State
improperly exercised one of its strikes against her. Consequently, Trevino's complaint is limited
to the State's striking of Number 26. 
          As a reviewing court, we review the evidence adduced at a Batson hearing in the light most
favorable to the trial court's ruling, and we will not disturb the trial court's finding that the State
exercised its strikes in a race-neutral manner unless the ruling is clearly erroneous. Kemp v. State,
846 S.W.2d 289, 304 (Tex. Crim. App. 1992); Stiles, 927 S.W.2d at 727. The trial court's ruling
will be found to be clearly erroneous only if no plausible basis exists to support it. See Whitsey
v. State, 796 S.W.2d 707, 721-22 (Tex. Crim. App. 1990) (on rehearing); Stiles, 927 S.W.2d at
727. 
          During the Batson hearing, the State asserted that it peremptorily struck Number 26
because: (1) he indicated on his juror information sheet that he was a single parent which, in the
State's opinion, represented "poor moral character;" and (2) during voir dire, he stated he would
have difficulty in convicting a defendant on the basis of only one witness' testimony. The Court
of Criminal Appeals has held that not being able to follow the "one witness rule" is sufficiently
race-neutral to counter a Batson challenge. See Esteves v. State, 849 S.W.2d 822, 823 (Tex.
Crim. App. 1993). 
          Number 26's status as a single parent provides a much more tenuous basis for his
exclusion. An explanation for a peremptory challenge based upon a person's marital status is
suspect unless the group trait asserted—in this case "poor moral character"—can be shown to apply
to the challenged venire member. See Whitsey, 796 S.W.2d at 716; Brown v. State, 925 S.W.2d
1, 3 (Tex. App.—Tyler 1994), rev'd on other grounds, 913 S.W.2d 577, 580 (Tex. Crim. App.
1996). However, the fact that the State had already provided a race-neutral reason for exercising
one of its peremptory strikes against Number 26 constitutes sufficient reason for his exclusion
from the jury. See Brown, 925 S.W.2d at 3.
          Having carefully examined the record of the Batson hearing and the voir dire, we conclude
that the trial court's finding that the State did not engage in any purposeful discrimination is
supported by the record and was not, therefore, clearly erroneous. Trevino's third point is
overruled.
VIOLATIONS OF PRETRIAL MOTIONS
          In his fourth point of error, Trevino complains the trial court erred in failing to grant his
motion for a mistrial after the State violated the court's ruling on Trevino's motion to suppress and
his motion in limine. Prior to trial, Trevino filed a motion to suppress the following evidence: (1)
three pornographic videos found in his living room; (2) a brief case containing pornographic
videos found in his bedroom; and (3) eight pornographic videos found in his bedroom. Trevino
also filed a motion in limine requesting that the State refrain from mentioning the above-listed
items during the course of the trial. The trial court granted Trevino's motion to suppress, and the
State had no objection to the motion in limine.
          Trevino alleges the following excerpt from C.W.'s testimony violated both motions:
[STATE:] . . . . Before y'all went to bed, what had y'all been doing?
 
[WITNESS:] Drinking beer and sitting around.
 
[STATE:] Did y'all watch any movies?
 
[WITNESS:] Yes.
 
[STATE:] Can you tell the jury what kind of movies y'all were watching?
 
[DEFENSE:] Objection, Your Honor.
 
[COURT:] What?
 
[DEFENSE:] May we approach, Your Honor?
 
[COURT:] Yes.
 
(Side-bar discussion.)
 
                    [COURT:] Ask your question.
 
[STATE:] Can you tell the jury what kind of movies y'all were watching?
 
[WITNESS:] Dirty movies.
 
[STATE:] What did the movies have on them?
 
[DEFENSE:] Your Honor, I would like to object to the introduction of this
evidence. I would ask for a motion to strike and disregard and motion for
a mistrial.
 
[COURT:] Overruled.
 
[STATE:] What did the movies have on them?
 
[WITNESS:] Guys and girls.
 
[STATE:] What were they doing?
 
[WITNESS:] Having sex.
 
[STATE:] Where did the movies come from?
 
[WITNESS:] Out of a little white drawer.
 
[STATE:] A little white drawer where?
 
[WITNESS:] Of the dresser.
 
[STATE:] Where was the dresser?
 
[WITNESS:] In the living room.
          We need not address Trevino's complaint because he has failed to properly preserve it for
our review. To preserve error for appellate review, the complaining party must make a timely,
specific objection and obtain a ruling on the objection. Tex. R. App. P. 52(a); Tex. R. Crim.
Evid. 103(a)(1); Broxton v. State, 909 S.W.2d 912, 918 (Tex. Crim. App. 1995). Trevino did
object to the State's asking C.W. what type of movies he had watched at Trevino's house;
however, neither of his two objections stated the specific grounds on which he was objecting. A
general objection is insufficient to preserve a complaint for review unless the grounds for the
objection are obvious to the trial court. See Tex. R. App. P. 52(a); see also Camacho v. State,
864 S.W.2d 524, 533 (Tex. Crim. App. 1993). Reviewing the record, we can find no specific
objection to C.W.'s testimony; consequently, we conclude that Trevino has failed to satisfy his
burden on appeal. See Tex. R. App. P. 50(d); see also Taylor v. State, No. 0048-95, slip op. at
9-11 (Tex. Crim. App. October 9, 1996) (if it is apparent from the record that the trial court
understood appellant's objection, then a general objection is sufficient to preserve error). 
Trevino's fourth point is overruled.
          Having overruled all of Trevino's points on appeal, we conclude that no error occurred at
the trial level and hereby affirm the trial court's judgment.
 
 
                                                                                 BOBBY L. CUMMINGS
                                                                                 Justice

Before Chief Justice Davis,
          Justice Cummings, and
          Justice Vance
Affirmed
Opinion delivered and filed March 19, 1997
Do not publish