Michael Thomas STILES, Appellant,

v.

The STATE of Texas, Appellee.

No. 10–94–073–CR.

Court of Appeals of Texas,
Waco.

July 17, 1996.

Kathi A. Drew, Dallas, for appellant.

John C. Vance, Criminal District Attorney, Anne B. Wetherholt, Asst. District Attorney, Dallas, Robert Huttash, State's Attorney, Austin, for appellee.

Before CUMMINGS and VANCE, JJ.

## OPINION

CUMMINGS, Justice.

Appellant Michael Thomas Stiles was convicted by a jury on one count of first degree injury to a child and was sentenced by the same jury to fifty years of confinement in the Institutional Division of the Texas Department of Criminal Justice. TEX. PENAL CODE ANN. § 22.04 (Vernon 1994). Stiles raises fifteen points on appeal. In point one he contends the State violated *Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), by striking three members of the venire panel solely because of their race. In points two through five he argues the trial court erred in allowing his confession into evidence because it was obtained without Stiles having been read the statutory *Miranda* warnings. *See* TEX.CODE CRIM. PROC. ANN. art. 38.22, § 2 (Vernon 1979); *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). In points six through eleven Stiles contends the same confession was inadmissible because law enforcement officials, before taking the confession, refused to honor his request for the assistance of counsel during the interrogation. In point twelve Stiles maintains that the trial court erred in failing to file findings of fact and conclusions of law on the voluntariness of his confession. In points thirteen and fourteen Stiles argues the trial court erred in allowing evidence of extraneous offenses before the jury. And in his final point Stiles complains about improper jury argument. We affirm.

On November 29, 1993, the date of the offense, Stiles was living in a mobile home in Irving with his girlfriend, Paula Darlene Genzel, their two children, Michael Antoni Thomas Stiles (referred to by his parents as Antoni) and Andromeda Marie Stiles (nicknamed Andy), and Genzel's third child, Destiny Lynn Jackson, who was fathered by another man. Andy was three months old, Antoni was two years old, and Destiny was seven.

On the morning of November 29, Andy awoke around 7:30. Sometime between 8:00 and 8:30, Genzel, who had been feeling ill, asked Stiles if he would feed Andy, and he agreed. Stiles went into the kitchen to warm her bottle and asked Genzel to retrieve a clean diaper so that he could change her. Stiles then took Andy into the master bedroom and closed the door.

According to Stiles, he changed her diaper and then, after sitting down on the waterbed, he sat her in his lap and fed her baby formula from the bottle. After Andy drank a few ounces of formula, Stiles took the bottle away from her because he was afraid she

would drink too much. Andy then began to fuss. Stiles then played with Andy for awhile until Antoni came into the bedroom. Stiles quickly ordered him to leave the bedroom. After Antoni left, Stiles fed Andy the rest of the bottle. Stiles then burped Andy, and she vomited on his shirt. Stiles became angry and threw her onto the waterbed. Andy's head struck a rail that ran alongside the bed. Andy screamed and began to choke. Stiles called for Genzel. Aside from the brief moment when Antoni ran into the bedroom, Stiles was alone in the bedroom with Andy with the door closed during the time of the events immediately preceding her injury. Stiles's confession constituted the only direct evidence of what occurred between him and Andy while in the bedroom.

When Genzel arrived in the room, Andy was blue. Genzel felt for a pulse and breathed into Andy's mouth. Andy vomited into Genzel's mouth. Genzel then tried breathing into Andy's nose. Genzel was unable to locate a pulse, but Andy occasionally convulsed and vomited during these convulsions.

At this time, Genzel asked Stiles to call for an ambulance. At first he refused, and Genzel tried to walk past him to leave the bedroom. Stiles, however, blocked her way, and Genzel fell. Stiles then changed his mind and telephoned for emergency assistance. Emergency-assistance personnel then gave instructions over the telephone on how to care for Andy, and Stiles relayed the instructions to Genzel, who followed them. Paramedics from the Irving Fire Department arrived soon thereafter and, upon examining Andy, were able to locate a pulse. Andy was first transported to Irving Hospital and then to Children's Hospital in Dallas. Andy was placed on life support at Children's Hospital and was ultimately declared dead on November 30, 1993, when her life support apparatus was removed. Dr. Jeffery Barnard, Chief Medical Examiner for Dallas County, determined that the cause of Andy's death was blunt force trauma to her head.

■ In his first point of error Stiles contends the trial court erred in overruling his motion to strike the jury panel after the State had improperly used three peremptory challenges allegedly in violation of *Batson v. Kentucky*, 476 U.S. at 86, 106 S.Ct. at 1717. Stiles, who is white, complains that the State impermissibly struck three black veniremen, numbers 18, 23, and 25, solely because of their race. *See Powers v. Ohio*, 499 U.S. 400, 409–10, 111 S.Ct. 1364, 1370, 113 L.Ed.2d 411 (1991) (the holding in *Batson* is applicable to a white defendant who strikes black veniremen on the basis of their race).

■ When a *Batson* complaint is made to the trial court, the defendant has the initial burden of making a prima facie case of racial discrimination, thereby raising a presumption of a *Batson* violation. *Harris v. State*, 827 S.W.2d 949, 955 (Tex.Crim.App. 1992), *cert. denied*, 506 U.S. 942, 113 S.Ct. 381, 121 L.Ed.2d 292 (1992). If the defendant makes a prima facie showing of discrimination, a "*Batson* hearing" is then held and the burden shifts to the State to present a race-neutral reason or reasons for striking the venireman. *Cantu v. State*, 842 S.W.2d 667, 688 n. 15 (Tex.Crim.App.1992), *cert. denied*, 509 U.S. 926, 113 S.Ct. 3046, 125 L.Ed.2d 731 (1993). Upon such presentation, the burden shifts back to the defendant to rebut the State's race-neutral reasons by refuting or impeaching the race-neutral reasons or showing that they are merely a pretext for discrimination. *Id.* It is at this third stage that the court determines whether the venireman, or veniremen, at issue was actually struck for a race-neutral reason. *Purkett v. Elem*, —— U.S. ——, ——, 115 S.Ct. 1769, 1770, 131 L.Ed.2d 834 (1995); *Joseph v. State*, 916 S.W.2d 657, 659–60 (Tex.App.— Houston [14th Dist.] 1996, no pet.).

During voir dire, Stiles made a prima facie showing that the State struck veniremen 18, 23, and 25 because they were black. A *Batson* hearing followed, and the State responded that it did not strike these veniremen because of their race. It asserted the fact that it had allowed three other black veniremen to sit on the jury demonstrated the State's lack of bias against black veniremen. The State also asserted that it struck veniremen 18, 23, and 25 because they all had relatives who had been in trouble with the law. The State asserted that: venireman 18's sister and brother-in-law had been tried

for sexual abuse and found not guilty; that venireman 23 had a brother-in-law currently serving a sentence in the penitentiary for murder;[1] and venireman 25's uncle was currently serving a jail sentence for check fraud. The State then further defended its strikes of veniremen 18, 23, and 25 by noting that it struck a white juror, venireman 3, whose son had been in trouble with the law on three occasions and was incarcerated at least twice, once for robbery and once for drug possession.[2]

Stiles responded by noting that the State did not strike venireman 33, a white woman, whose nephew had been convicted of breaking and entering a habitation in San Antonio. Stiles also commented that since it was venireman 23's brother-in-law, not brother, who had been convicted of murder the connection between the two was not strong and would not have much effect on the venireman's objectivity. Stiles argued further that it is inconsistent for the State to allow venireman 33, a white woman, whose son had been convicted of burglary of a habitation,[3] to sit on the jury while the State struck venireman 25 whose uncle had been convicted of the less serious offense of check fraud. With regard to venireman 18, Stiles argued that she had stated she could be a fair and impartial juror; therefore, he contended that there was no reason to strike her.

The State responded that, concerning venireman 23, there is no meaningful difference between one's concern for his brother and one's concern for his brother-in-law. The State also noted that it was venireman 33's nephew, not son, who had been convicted of burglary in San Antonio. Moreover, the nephew was not serving any time in the penitentiary, but had been given a probated sentence. In addition, the State defended its failure to strike venireman 33 on the ground that her husband is the Fire Marshall in the City of Lancaster, which indicated to the State that she would be a strong State-oriented juror, especially due to the fact that the State intended to call medical personnel from the Irving Fire Department to testify.

We review the evidence adduced at *Batson* hearings in the light most favorable to the trial court's ruling. *Kemp v. State*, 846 S.W.2d 289, 304 (Tex.Crim.App.1992), *cert. denied*, 508 U.S. 918, 113 S.Ct. 2361, 124 L.Ed.2d 268 (1993). A trial judge's finding that the State exercised its strikes in a race-neutral manner will not be overturned unless such ruling is clearly erroneous. *Id.* The trial court's ruling will be found to be clearly erroneous only if no plausible basis exists to support it. *See Whitsey v. State*, 796 S.W.2d 707, 721–22 (Tex.Crim.App.1990) (on rehearing) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)).

It is well-established that the striking of a venireman because a relative had been formally accused of criminal wrongdoing will constitute a race-neutral reason for striking him. *See Harris*, 827 S.W.2d at 955; *Garcia v. State*, 833 S.W.2d 564, 567 (Tex.App.—Dallas 1992), *aff'd*, 868 S.W.2d 337 (Tex.Crim.App.1993); *Wilson v. State*, 769 S.W.2d 682, 683 (Tex.App.—Beaumont 1989, no pet.). The State's assertion that it did not strike venireman 33 because her husband is a fire marshall and therefore would probably be a prosecution-oriented juror is plausible. The fact that the State also struck venireman 3, a white juror whose son had been convicted three times of criminal offenses, further supports the trial court's ruling. We note that the State still struck venireman 3 even though he indicated that he thought his son was rightly treated by the criminal justice system, that his son "got what he deserved," and that he would not be affected as a juror by his son's experiences in the criminal jus-

---

1. Although the State gave as its reason for striking venireman 23 that his brother-in-law had been convicted of murder, the record reveals that venireman 23, during voir dire, stated that his brother-in-law had been convicted of burglary, not murder.

2. The record shows that venireman 3 stated that his son had been convicted of three criminal offenses: the first was either the violation of a restraining order or the obstruction of justice; the second was shoplifting; and the third was drug possession.

3. The record reflects, however, that venireman 33 in voir dire stated that her nephew, not son, had been convicted of breaking and entering, not burglary, in San Antonio.

tice system. Having carefully examined the record of the *Batson* hearing and the voir dire, we conclude that the trial court's finding of no purposeful discrimination is supported by the record and was not, therefore, clearly erroneous. We overrule Stiles's first point of error.

In his third through eleventh points of error, Stiles complains the trial court erred in overruling his motion to suppress the two documents which comprise the confession he gave to the Irving Police Department on November 30 and December 1, 1993. Specifically, in points two and three he alleges law enforcement officials obtained his confession without reading him the warnings required by *Miranda*. In points four and five he complains that law enforcement officials also failed to read him his statutory warnings as required by TEX.CODE CRIM. PROC. ANN. art. 38.22, § 2. In points six and seven he complains the confession was illegally obtained in violation of his fifth amendment right to counsel. U.S. CONST. amends. V, XIV. In points eight and nine he alleges the confession was obtained in violation of his right to counsel under article I, section 10, of the Texas Constitution. TEX. CONST. art. I, § 10. And in points ten and eleven he asserts the confession was obtained in violation of his statutory right to counsel under TEX. CODE CRIM. PROC. ANN. art. 38.22, § 2.

The record reveals that, on the date of the offense, Irving Police Officer John Cshingle was patrolling the area where Genzel and Stiles lived when he noticed an ambulance and a fire truck near their home. Officer Cshingle inquired from one of the firemen on the scene the reason for their presence. The fireman responded that they were taking a three-month old baby to Irving Hospital. Officer Cshingle then drove straight to the hospital where he met Stiles. He spoke with Stiles about the cause of Andy's injuries, and Stiles explained that, after he had fed Andy earlier that morning, she threw up and started choking on her own vomit. During their conversation, Stiles also mentioned to Officer Cshingle that there were some warrants outstanding for his arrest for some traffic violations. Officer Cshingle believed that Stiles did not seem saddened or upset by the inju-

ries Andy had sustained, which caused Officer Cshingle to be suspicious of him.

Sometime after Officer Cshingle left the hospital, he heard from Investigator Fred Curtis of the Irving Police Department that Stiles might be leaving for California. Therefore, at around 2:15 p.m. on the following day, Officer Cshingle drove to Genzel's and Stiles's home to arrest him for the outstanding traffic warrants. Officer Cshingle took him into custody, read him his statutory *Miranda* warnings, and put him in his patrol car.

At about the time Officer Cshingle put Stiles in the patrol car, Investigator Curtis arrived at the scene. Investigator Curtis, while Stiles was in the patrol car, informed him that he was being taken to the Irving Police Department, that arrest warrants were currently outstanding for him for some traffic violations, and that Investigator Curtis wanted to speak to Stiles about Andy. Investigator Curtis also read Stiles the statutory *Miranda* warnings.

Once they arrived at the police station, Investigator Curtis began to interrogate Stiles in a private room. After Investigator Curtis spoke only briefly to Stiles, Stiles stated that he did not want to talk to him anymore, and the interview ended. Investigator Curtis then returned Stiles to the jail area of the police station.

About 30 to 45 minutes later Stiles notified one of his jailers, Officer Bryan Smith, that he wished to speak to Investigator Curtis again. Investigator Curtis was informed of Stiles's request, and he returned to the jail area to see Stiles. Investigator Curtis asked him if he wished to speak to him, and Stiles answered, "Yes." Before the interrogation recommenced, Investigator Curtis asked Stiles if he understood his *Miranda* warnings, and Stiles responded in the affirmative. Investigator Stiles did not, however, re-read the warnings for Stiles. Stiles then made a statement that was recorded on a dictaphone. The statement was subsequently played from the dictaphone and typed onto paper. After it was typed, the paper was then read back to Stiles, and it was shown to him so that he could read it. In the statement Stiles stated, among other things, that while trying to burp

Andy, she vomited on his shirt and that that made him angry so he threw her down on the bed. He asserted that he threw her down without thinking, that he never intended to hurt her, that it was just a reaction, and that it was an accident that she hit her head. Stiles then signed the statement.

Sometime after Stiles gave his statement, Investigator Curtis spoke with Dr. Barnard, who had performed the autopsy on Andy. Dr. Barnard told Investigator Curtis that more force than what Stiles had claimed to have used would have been required to cause Andy's injuries. Investigator Curtis, consequently, decided to speak to Stiles again. Upon seeing Stiles, Investigator Curtis reminded him of the statutory *Miranda* warnings and informed Stiles about Dr. Barnard's opinion. Stiles decided then to make another statement, wherein he stated that, after Andy vomited on him, he became angry and "slammed" her onto the waterbed with "about half the force" that he could muster.[4] Stiles also confessed to having lied in the previous day's statement. Stiles read the statement and signed it.

 In a suppression hearing, the trial court is the sole trier of fact and judge of the credibility of the witnesses and the weight to be given their testimony. *Romero v. State*, 800 S.W.2d 539, 543 (Tex.Crim.App.1990); *Roth v. State*, 917 S.W.2d 292, 299 (Tex. App.—Austin 1995, no pet.). The trial court may accept or reject any or all of any witness's testimony. *Alvarado v. State*, 853 S.W.2d 17, 23 (Tex.Crim.App.1993); *Allridge v. State*, 850 S.W.2d 471, 492 (Tex.Crim.App. 1991), *cert. denied*, 510 U.S. 831, 114 S.Ct. 101, 126 L.Ed.2d 68 (1993). The trial court resolves all conflicts in the testimony. *Hawkins v. State*, 853 S.W.2d 598, 600 (Tex. App.—Amarillo 1993, no pet.) An appellate court must view the evidence in the light most favorable to the trial court's ruling at the suppression hearing. *Upton v. State*, 853 S.W.2d 548, 553 (Tex.Crim.App.1993); *State v. Hamlin*, 871 S.W.2d 790, 792 (Tex.App.— Houston [14th Dist.] 1994, pet. ref'd); *Spill-*

*man v. State*, 824 S.W.2d 806, 810 (Tex. App.—Austin 1992, pet. ref'd). If the trial court's findings are supported by the record, the court on appeal will not disturb the findings absent an abuse of discretion. *Cantu v. State*, 817 S.W.2d 74, 77 (Tex.Crim.App. 1991). In the instant case, the trial court denied Stiles's motion to suppress the two statements on the ground that they were given voluntarily and that Stiles had freely and voluntarily waived his rights under *Miranda*.

 In his second and third points of error, Stiles asserts that the prophylactic warnings required by *Miranda* were not read to Stiles either time he made a statement and, therefore, the statements were inadmissible. He asserts that Investigator Curtis merely "reminded" Stiles of the *Miranda* warnings and, because *Miranda* allegedly requires that the warnings be read each time interrogation takes place, Investigator Curtis's reminder was insufficient. In points of error four and five Stiles makes essentially the same argument under article 38.22, section 2, of the Code of Criminal Procedure.

 The record is clear that Stiles was read the statutory *Miranda* warnings at least twice before he gave either statement. Whether or not law enforcement officials subsequently read the warnings to Stiles again each time he was interrogated is irrelevant. *Allridge v. State*, 762 S.W.2d 146, 157–58 (Tex.Crim.App.1988), *cert. denied*, 489 U.S. 1040, 109 S.Ct. 1176, 103 L.Ed.2d 238 (1989). It is true that Stiles invoked his right not to speak to any law enforcement officials before the interrogation which led to the first and second statements began, but Stiles freely and voluntarily relinquished that right when he told his jailer, Officer Smith, that he wanted to speak to Investigator Curtis again. Stiles contends that there was no waiver because, when he requested to speak to Investigator Curtis again, the only subject he wanted to discuss with Investigator Curtis

---

4. Although not clear from the statement itself, Investigator Curtis testified that he understood from his conversations with Stiles prior to and

during Stiles's issuance of the second statement that Stiles was wanting to confess to purposefully slamming Andy's head onto the bedrail.

was the reason for Andy's death.[5] Stiles's argument is meritless for two reasons.

First, nowhere in the record is it stated that either Officer Smith or Investigator Curtis was made aware of the limited nature of Stiles's waiver. The reason for the *Miranda* prophylactic warnings is to "insure that the right against compulsory self-incrimination [is] protected." *Michigan v. Tucker*, 417 U.S. 433, 444, 94 S.Ct. 2357, 2364, 41 L.Ed.2d 182 (1974). As Stiles admits in his brief, Investigator Curtis "scrupulously honored" Stiles's request to end the interview. *See Miranda*, 384 U.S. at 479, 86 S.Ct. at 1630. According to Officer Smith and Investigator Curtis, Stiles then wanted to speak to Investigator Curtis further. Subjectively, Stiles may have wanted only to speak about the cause of Andy's death. But the test for whether Stiles properly waived his right not to be interrogated any further is an objective one. *See Davis v. United States*, 512 U.S. 452, ——, 114 S.Ct. 2350, 2355, 129 L.Ed.2d 362 (1994) (holding that the test for whether a criminal suspect has invoked his fifth amendment right to counsel is an objective one). A reasonable person hearing Stiles's request would have thought that he wished to allow Investigator Curtis to proceed with the interrogation. Stiles's subjective intent simply does not factor into the equation.

 Second, we are aware of no authority allowing the criminal suspect to set the parameters of the interrogation. The law is clear that Stiles had the right to terminate his interrogation at any time. TEX.CODE CRIM. PROC. ANN. art. 38.22, § 2. The law is also clear that Stiles could subsequently waive his invocation of that right. *See Edwards v. Arizona*, 451 U.S. 477, 484, 101 S.Ct. 1880, 1884–85, 68 L.Ed.2d 378 (1981); *Hicks v. State*, 860 S.W.2d 419, 429–30 (Tex. Crim.App.1993), *cert. denied*, —— U.S. ——, 114 S.Ct. 2725, 129 L.Ed.2d 848 (1994). The issue to be resolved when the suspect then wishes only partially to waive his right to end the interrogation would be whether the suspect actually completely waived his right.

*See Davis*, 512 U.S. at ——, 114 S.Ct. at 2355 (a statement is either an assertion of the fifth amendment right to counsel or it is not). It would seem that if a suspect, after invoking his right to end the interview, then notifies law enforcement officials that he wishes to recommence the interrogation, questioning could then proceed, and if the suspect should later find that he would prefer not to answer any more questions, then he could re-invoke his right to terminate the interview. It would be futile for this court to require law enforcement officials to recognize the extent to which the suspect has waived his right to halt any questioning. Well-meaning law enforcement officials could, without intent, run afoul of the proposed limitation on the waiver and obtain inculpatory information that would later be held inadmissible in court even though there was no undue compulsion used against the suspect and no violation of the *Miranda* prophylactic rules. We will not create such an ill-advised requirement.

In sum, Stiles was properly read the statutory *Miranda* warnings at the time of his arrest. He was subsequently interrogated, and he invoked his right to terminate the interview. Approximately 30 to 45 minutes later, he freely and voluntarily waived that right by asking to speak to Investigator Curtis again. Because Stiles had already been read the statutory *Miranda* warnings, Investigator Curtis was not required to read the warnings to Stiles again before recommencing the interrogation. Stiles's second and third points are overruled.

 In points six through eleven Stiles contends his rights to counsel under the fifth amendment to the United States Constitution, under article I, section 10, of the Texas Constitution, and article 38.22, section 2, of the Code of Criminal Procedure were violated when Investigator Curtis recommenced the interrogation after Stiles had allegedly stated to Investigator Curtis that he wanted to talk to a lawyer. Investigator Curtis, however, denied that Stiles requested a law-

---

**5.** At the suppression hearing, Stiles testified that he could not remember if he had told Officer Smith that he wanted to speak to Investigator Curtis again. He later, however, testified that the reason he wanted to speak to Investigator Curtis again was so that he could find out the reason for Andy's death. We can only conclude from this inconsistency that Stiles did tell Officer Smith that he wanted to speak to Investigator Curtis again.

yer. Investigator Curtis testified that Stiles only requested that the interview cease and that he honored that request. In a suppression hearing, the trial court resolves all conflicts in the testimony and may accept or reject any or all of any witness's testimony. *Alvarado*, 853 S.W.2d at 23; *Allridge*, 850 S.W.2d at 492; *Hawkins v. State*, 853 S.W.2d 598, 600 (Tex.App.—Amarillo 1993, no pet.). Here, the trial court implicitly rejected Stiles's testimony that he requested an attorney and, instead, chose to believe Investigator Curtis. Therefore, we must accept the trial court's conclusion that Stiles did not request an attorney. Because Stiles never requested an attorney, he cannot complain that Investigator Curtis violated his rights in failing to provide him one. Points six through eleven are overruled.

■ In point of error twelve Stiles asserts the trial court erred in failing to make findings of fact and conclusions of law on the voluntariness of his confession. *See* TEX. CODE CRIM. PROC. ANN. art. 38.22, § 6 (Vernon 1979). On March 20, 1995, a supplemental transcript was filed in this court containing the trial court's finding of facts and conclusions of law on the voluntariness of Stiles's confession. Stiles's complaint in his twelfth point is moot; therefore, we overrule his point of error.

■ In his thirteenth point Stiles complains that the trial court erred in not granting his motion for a mistrial after evidence of an extraneous offense was admitted to the jury. Stiles complains about a portion of the first statement of his confession wherein he stated, in essence, that part of the reason he threw Andy onto the bed was because he felt pressure from having been investigated by Child Protective Services (CPS) for breaking one of Antoni's legs.[6]

At the hearing to determine the voluntariness of Stiles's confession, Stiles made no objection that the complained-of statement constituted an inadmissible extraneous offense. After the hearing, the State asked Investigator Curtis to read the first of Stiles's two statements. At that time, Stiles renewed his objection that the confession was made involuntarily, but he made no objection that the complained-of statement was an extraneous offense. The trial court overruled Stiles's objection, and Investigator Curtis read the first statement.

After the statement was read, and more testimony was taken from Investigator Curtis, the trial court, sua sponte and outside the presence of the jury, expressed its concern to the parties that it believed the complained-of statement constituted an extraneous offense. The State then informed the trial court that it would not oppose an instruction to the jury to disregard the comment. Stiles responded that an instruction to disregard would be insufficient to cure the alleged error and that the trial court should order a new trial because of the alleged error. The trial court ruled that it would issue an instruction to disregard but would not order a mistrial.

■ To preserve a complaint for appellate review, the appellant must make an objection at the time the error occurs. TEX. R.APP. P. 52(a); *Rhett v. State*, 839 S.W.2d 93, 94 (Tex.Crim.App.1992). This "contemporaneous objection" is necessary to provide the trial court with an opportunity to prevent any error from occurring, or to remedy any error, if possible, at the earliest possible moment. *See id.* Here, the alleged error about which Stiles complains occurred without any contemporaneous objection. No discussion of the possible error was even undertaken by Stiles until some time after it occurred and only after the trial court expressed its own reservations about whether an error had possibly occurred. Because Stiles did not raise a contemporaneous objection, he failed to preserve his complaint for our review.

■ Assuming that the complaint was preserved, there was nevertheless no error in allowing the complained-of statement into evidence. While evidence of extraneous offenses is generally not admissible to show the bad character of the criminal defendant, it is admissible for other purposes, such as proof of intent or absence of mistake or

---

**6.** Stiles also noted that the medical professionals who treated Antoni determined that the cause of the injury may have been an accident, which caused CPS to terminate its investigation.

accident. TEX.R.CRIM. EVID. 404(b); *see Nobles v. State,* 843 S.W.2d 503, 514 (Tex.Crim. App.1992); *Albrecht v. State,* 486 S.W.2d 97, 100–01 (Tex.Crim.App.1972).

The record is clear that Stiles admitted to throwing Andy onto the waterbed but that it was an accident that she hit her head against the bedrail. He contended that he never intended to hurt Andy and that he merely "tossed," Stiles's words to Investigator Curtis, Andy onto the bed in a fit of frustration due to several factors, including, the CPS investigation, the death of his mother, Genzel's unwillingness to work because of an illness, the noisiness of his children, and Andy's vomiting on him.

Stiles was charged with intentionally or knowingly injuring Andy. CPS investigated Stiles for the same offense with regard to Antoni, although it later discontinued the investigation for lack of specific evidence from the medical professionals who treated Antoni that his leg was purposefully broken by someone else. Evidence of the CPS investigation tended to make the conclusion more probable that Stiles either intentionally hurt Andy or knowingly threw her on the bed with a head injury a likely result. *See* TEX.R.CRIM. EVID. 401, 404(b). Therefore, evidence of the CPS investigation was admissible under rule 404(b), and Stiles's thirteenth point is overruled.

■ In point fourteen Stiles complains that the trial court erred in permitting Dr. Willis L. Starnes, a physician who examined Andy at Irving Hospital on the date of the offense, to testify about other extraneous offense evidence, namely, that Andy had been a victim of sexual abuse. Dr. Starnes testified that he had found recent or "fresh" bruises and tears in the area of Andy's rectum and anus. He stated further that these injuries were caused by "a blunt object of fairly substantial diameter being inserted into her anus ... on several occasions."

In Stiles's confession he stated that during the three weeks prior to the offense, only he, Genzel, Destiny, and Antoni had access to Andy. He also stated that Genzel always treated Andy well and that he did not believe she would have hurt her. These facts strongly indicate that only Stiles could have been the party to have sexually abused Andy, as Dr. Starnes suggested did occur. Stiles's defense to the charged offense was that he never intended to hurt Andy. As stated above, rule 404(b) allows evidence of extraneous offenses to prove, among other things, intent and the absence of mistake or accident. TEX.R.CRIM. EVID. 404(b). Therefore, the testimony from Dr. Starnes that Andy had been sexually abused was admissible under rule 404(b) to demonstrate that Andy's head injury was not the result of any accident but due to an intentional or knowing act on the part of Stiles that was either designed to cause Andy serious injury or was likely to cause Andy serious injury. Stiles's fourteenth point is overruled.

■ In his fifteenth point of error Stiles complains the trial court erred in overruling his objection to an allegedly improper jury argument by the State. The relevant portion of the State's closing argument is as follows:

[STATE]: I submit, Ladies and Gentlemen, that the best case scenario for the defense is ... that ... [Stiles] didn't want this child. He was angry. He was frustrated, fed up with his problems. And he took out ... his anger on this child. He threw her down. And he knew, as we know, when you throw down a child like this, that they're going to be hurt.

Consider a more vile alternative. Again, we have only the evidence. We tried to bring you everything that we have. He took this child into this bedroom and closed the door. You've seen what was there[.]

We know that this child has recent rectal tears consistent with penetration from the exterior, from a blunt object. Doctor Starnes can't say what: finger, pen[i]s, some blunt object.

I would submit, it's a reasonable deduction from the evidence, that he's angry. Whether this is for some sick pleasure or whether this is just anger, he's striking back at that child that has made his life all the more uncomfortable. This child starts to cry. This is tough to explain, if someone comes in and sees him doing some-

thing to this child. He has to quiet the child.

[DEFENSE]: Objection, Your Honor. This is outside the evidence. Totally outside the evidence.

THE COURT: Members of the Jury, you'll remember the evidence and that's the only thing you would be guided by.

[DEFENSE]: Also, Your Honor, it's inflammatory. We would also ask that you direct the jury to disregard that last statement.

THE COURT: Overruled.

■ On appeal, Stiles contends that the portion of the State's closing argument, above, was improper for two reasons: (1) it was not a reasonable deduction of the evidence, and (2) it was inflammatory. We note that Stiles failed to pursue his objection that the State's argument went outside the evidence until he received an adverse ruling from the trial court and, therefore, he failed to preserve his complaint for our review. TEX.R.APP. P. 52(a); *Flores v. State*, 871 S.W.2d 714, 722–23 (Tex.Crim.App.1993), *cert. denied*, —— U.S. ——, 115 S.Ct. 313, 130 L.Ed.2d 276 (1994). Nevertheless, in considering Stiles's complaint that the State's argument was inflammatory, we find that the State's argument was a reasonable deduction of the evidence and, therefore, it was not improper. *See Willis v. State*, 785 S.W.2d 378, 384 (Tex.Crim.App.1989), *cert. denied*, 498 U.S. 908, 111 S.Ct. 279, 112 L.Ed.2d 234 (1990) (the four permissible areas of jury argument are: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answers to arguments from the defense; and (4) pleas for law enforcement). As we held above, evidence was properly admitted that Stiles may have sexually abused Andy on several occasions. It was reasonable for the State to argue from this evidence that a possible motivation for Stiles's decision to throw Andy onto the bed was that he became angry when she cried during the course of one of his sexual assaults on her. Because the State's argument was a reasonable deduction from the evidence it was neither outside the record nor inflammatory. Stiles's fifteen point is overruled, and the judgment is affirmed.