TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN






NO. 03-99-00794-CR






Leopoldo Franco, Sr., Appellant



v.



The State of Texas, Appellee







FROM THE DISTRICT COURT OF BELL COUNTY, 264TH JUDICIAL DISTRICT


NO. 50,108, HONORABLE C. W. DUNCAN, JR., JUDGE PRESIDING







 A jury convicted appellant Leopoldo Franco, Sr. of the capital murder of his four-month-old son, Michael Franco. See Tex. Penal Code Ann. § 19.03(a)(8) (West 1994). The
district court's jury charge included the lesser included offense of murder. See id. § 19.02(b). 
The State did not seek the death penalty, so the court assessed punishment at life imprisonment. 
Appellant brings four issues on appeal, attacking the sufficiency of the evidence, the jury's failure
to find him guilty of the lesser included offense, and the court's allowance of testimony alleging
extraneous bad acts during the guilt/innocence phase of the trial. We will affirm.


Facts

 On March 15, 1999, Steven Spink, a firefighter and paramedic for the City of
Belton, responded to an emergency call that an infant was not breathing. When he arrived at the
apartment, he saw an infant, Michael Franco, lying on the floor and several people standing in
the room. Appellant told Spink that Michael had been drinking juice in another room and had
begun to choke and gag. Spink noticed Michael's airway was clear and saw bruises on Michael's
head, forehead, and legs and a bite mark on his leg. At one point, appellant said, "You know,
I didn't do this." Spink testified the statement was made "out of the clear blue," and not in
response to a question.

 Officer Bremer assisted the initial investigation. Bremer stated appellant's
demeanor on the night Michael died was "quite calm, pretty cool about everything, very calm,
cool and collected." Bremer stated appellant did not appear to be grief stricken or in shock. 
Bremer recalled seeing appellant seated on a couch with his legs propped up, conversing with
family members. Appellant's demeanor struck Bremer as odd compared to behavior usually
exhibited by parents whose children are seriously injured. Bremer testified that appellant's
demeanor was not consistent with that of someone truly grief stricken and upset. Bremer also
observed Jessica Franco, Michael's mother, and he said she appeared to be somewhat in shock,
"[a] little sobbing here and there, but basically just pretty calm and cool and kept to herself." Her
behavior was more consistent with Bremer's experience with people in grief or traumatic
situations, but he agreed that people respond differently to grief.

 Katherine Hunnicutt, a registered nurse at the emergency room, said when Michael
arrived he was not breathing and had no pulse. Hunnicutt saw scratches on his nose and bruises
on his forehead, cheek, and ear. Upon further examination, Hunnicutt also observed puncture
marks on Michael's palm, scratches on his upper lip and the underside of his chin, swelling and
bruising on his left ear, bruises on his right cheek, left thigh, and kidney area, and a bite mark
on his thigh. The bruises varied in color. Hunnicutt testified that Michael's eyes showed scleral
hemorrhage, meaning broken blood vessels causing redness and bleeding in the whites of his eyes.

 After Michael was pronounced dead, Hunnicutt arranged for the family to sit with
Michael in a private room. Hunnicutt said Jessica Franco did not respond and had to be helped
into a wheelchair and brought to see him. When they entered the viewing room, appellant picked
up a rocking chair and threw it across the room, which scared Hunnicutt. When Hunnicutt placed
Michael in Jessica's arms, Jessica started crying and appellant then also began crying loudly,
dropping to his knees. Jessica thrust the baby into Hunnicutt's arms, said, "Here, take this," and
knelt down to tend to appellant. Hunnicutt said the behavior of both the parents was out of the
ordinary and worried her. In particular, she was surprised by appellant's throwing the chair and
by Jessica's being more concerned with appellant than with Michael; in other cases, Hunnicutt
usually had to almost pry the babies away from the mothers.

 Mark Brown, an investigator with child protective services, was called to
investigate the situation when he learned Michael had died in his parents' custody. He went to
the apartment and met with appellant and Jessica, and appellant told Brown that appellant, Jessica,
and Michael had been in the bedroom most of the day, with Michael in the bassinet. The other
children had been outside playing most of the day. Appellant stated that early in the evening,
Jessica went to the kitchen to make dinner while he watched television in the living room. Brown
testified appellant said he went to the bedroom and gave Michael a bottle of juice, propping
Michael up on a pillow and "propp[ing] a bottle of juice up as well." Appellant watched
television in the living room for another thirty minutes, and when he returned to the bedroom, he
discovered Michael face down. Brown could not recall whether appellant said Michael was not
breathing or was struggling to breathe. Appellant told Brown he tried to resuscitate Michael and
told his sons to call the police.

 Officer Orange was the lead investigator into Michael's death. Orange arrived at
the apartment and saw several patrol officers and several family members. Orange learned that
when the first officers arrived on the scene, appellant was trying to revive Michael. Orange
testified that the apartment was dirty and cluttered. He said there were cockroaches and uneaten
food in the kitchen, clothes on the floors of the bedrooms, blankets and clothes stuffed in the two
bassinets, and a bottle of spoiled milk in one bassinet.

 Orange testified he took two statements from appellant. In his first statement, given
the night Michael died, appellant told Orange, "Between the hours of 6:00 a.m. till 6:50 p.m. we
were in the room all day with [Michael] . . . . At between 5:30 and 6:45, [Michael] was put to
bed and we . . . went to the living room. [Michael] was placed in the bassinet face up and bottle
was removed prior [to] placing him into the bassinet. . . . At 7:25, [appellant] went to check on
[Michael] and found [his] face face [sic] down, nose was smushed or closed." Appellant told
Orange that Michael was limp and his face was discolored and that when appellant picked him up,
Michael secreted clear liquid out of his nose and mouth.

 Appellant's second statement, given three days later, differed from his first
statement. In it, appellant stated that he, Jessica, Michael, and two of the other children had been
in the bedroom all day until about 5:50 p.m., when Jessica went to cook dinner. Appellant stated
Jessica decided to feed Michael before making dinner, but Michael would not eat. Jessica then
gave him some juice and then put Michael down on his right side in the bassinet and placed a
blanket behind him to keep him from rolling onto his back where he could choke. Appellant said
he and Jessica then left the room and left the door open so they could hear if Michael woke up. 
Appellant stated he asked Jacob, one of his other sons, to get appellant's glass from the bedroom. 
When Jacob brought the glass to appellant, Jessica asked about Michael, and Jacob said he was
fine. Appellant ate dinner and then decided to check on Michael. He walked into the bedroom,
and saw that Michael was face down in the bassinet. Appellant admitted biting Michael on the
leg once, but denied doing it to hurt him. He said the scratches under Michael's nose might have
been caused by a suction bottle used to remove mucous. Appellant said one of the other children
was jealous of Michael and had thrown things at him, bitten him in the face, and tried to hurt him
in other ways. When asked about Michael's other injuries, appellant said he had no explanation
for the injuries other than the bite marks on Michael's cheek and leg and scratches under his nose. 
Appellant denied hurting Jessica or the children.

 Jessica Franco, Michael's mother and appellant's wife, testified about appellant's
behavior towards Michael. She stated appellant never had a pet name for Michael, instead calling
him "a little faggot." Jessica testified she saw appellant bite Michael on his finger, ear, and thigh,
pinch and flick his nose, hit him in his face with a plastic or rubber ball, and push him up against
the wall, hitting his head on the wall. Jessica further testified that a couple of times she saw
appellant put his hand over Michael's mouth, but she stated she did not believe appellant intended
to harm Michael when he did this, but only to quiet him and stop his crying.

 Jessica said she had not disclosed appellant's abusive behavior earlier in the
investigation because she was scared of him and because he had told her "he would bring [her]
down with him" if she did not lie for him. Jessica admitted lying to the police, the grand jury,
medical and child protective services personnel, and appellant's and the State's attorneys, and not
cooperating with the investigation. Jessica stated she told the truth at trial because she was tired
of lying. She denied receiving any promises in return for her testimony and said she was afraid
because she knew she could be in trouble for having lied earlier. Jessica testified appellant had
reason to be angry at her because she had moved in with another man. She admitted having told
the authorities that her other sons played with and irritated Michael, that one of them had bitten
him on his cheeks, and that her pet ferret might have scratched him. Jessica denied causing any
of the bruises on Michael's body. Jessica testified that on the day Michael died, appellant was
alone in a bedroom with him.

 Michael Burns, an inmate who had been incarcerated with appellant, testified that
appellant had told him appellant went into the bedroom and put his hand over Michael's mouth
to stop his crying. When Michael stopped crying, appellant left the room. Michael started to cry
again, and appellant again put his hand over Michael's mouth until he stopped crying. Later,
someone discovered Michael was dead. Burns testified appellant admitted biting Michael,
claiming he was playing with him and showing affection. Burns said appellant had described
Michael as "weaker than the rest of the kids, always crying, sissy, faggot was another word." 
Burns said that appellant said he put his hand over Michael's mouth not to hurt Michael, but to
stop his crying. Burns admitted having been convicted of theft, credit-card abuse, and insurance
fraud. He said he was testifying because he loved children and he did not want appellant to get
away with hurting Michael.

 Appellant's sister, Cynthia Munoz, testified that appellant called Michael "faggot"
and "bastard." She saw appellant bounce a ball off Michael's head and then laugh about it with
Jessica. Munoz testified appellant hit or "popped" Michael with a wet rag, pinched him, and
tossed him in the air when he was a month old, scaring him. Munoz saw appellant cover
Michael's mouth with appellant's hand when Michael cried; appellant's hand covered all of
Michael's face, including his mouth and nose. She also saw appellant cover Michael's face with
a pillow and then remove it to let Michael gasp for air. Munoz testified that appellant pushed hard
with his thumb on Michael's nose, making Michael scream. At one point, Munoz asked to take
Michael with her; appellant agreed and told Jessica to get Michael's things together. Appellant
then changed his mind, saying he would not have anyone to pick on if Michael was gone. Munoz
stated she did not tell the authorities about appellant's abuse before Michael died because she was
scared of appellant's temper. Munoz said it appeared that when Michael cried in response to
appellant's behavior, appellant would "[l]augh like it was--I don't know like he was playing with
him, but serious." When questioned further, Munoz insisted appellant was serious and not just
playing with Michael. She said, "When you're playing with a child, there's a limit to play with
the child. When you continue and continue and continue, it's not a play [sic] no more, it's
serious."

 Imelda Munoz, appellant's niece and Cynthia Munoz's daughter, also testified she
saw appellant abuse Michael and call him names. She said she saw 

balls thrown at his head, a cup of water balanced on his head, throwing him up in
the air, suffocating by his mouth, a pillow thrown, him thrown to the other couch,
the ferret jumps on him, a rottweiler jumping on him, licking his face. . . . The
baby was always cold. They wouldn't ever put clothes on the baby. It was always
in a [diaper]. The baby was always purple . . . because it was so cold. 



Imelda also saw appellant hold a pillow over Michael's face and she said Michael would gasp for
breath when it was removed. Imelda said appellant usually would not back off from hurting
Michael, and said Michael's nose was bruised and red because appellant was always pushing
Michael's nose with his thumb. Imelda also saw Jessica stuff marshmallows in Michael's mouth. 
Imelda said appellant treated his older son better than Michael, treating him like "the king of the
house." Imelda saw Jessica "pop" Michael with a towel, but never saw her cover his face.

 Karen Kelley, one of appellant's former neighbors, testified to seeing appellant
twice put his hands over Michael's face for several seconds to stop Michael's crying. She stated
appellant's hand covered Michael's nose and mouth and when appellant removed his hand,
Michael would gasp to try to catch his breath. Other than those two occasions, Kelley never saw
appellant physically hurt Michael, but she did hear appellant call Michael obscene names, scream
at him, and tell him to shut up. Kelley admitted that she had a drug case pending and denied
making any arrangements with the district attorney in return for her testimony. She said she gave
her statement before the drug charges were brought. Kelley had given custody of her five
children to her husband because she did not know how long her case would be pending. Kelley
never contacted the authorities regarding appellant's behavior.

 Dr. Lori Wick was the pediatric doctor on duty at the emergency room. Wick said
Michael had multiple bruises, bite marks, abrasions, and scrapes. The most prominent injuries
were to Michael's face, where he was bruised on both cheeks, both ears, and the left side of his
head, and had scratches on the inside of his nose and on his lip. Michael also had a small
hemorrhage inside his eye and was swollen in front of both ears. Wick observed a few scattered
brown bruises on Michael's chest and torso, a linear purple bruise on his abdomen, small blue
bruises on both heels, small areas of skin missing from two toes, bruises on the bottom of his feet,
linear injuries between each of his fingers, a healing bite mark on his left thigh, and another bite
mark on his right side.

 Dr. Frank Miller performed the autopsy on Michael and found several bruises on
Michael's face, a healing abrasion on his right ear, a large contusion on his forehead with a much
larger bruise underneath on the underside of the scalp, abrasions on his nostrils, chin, and left
temple, and small bruises under the scalp on the rear of his head. Miller did not find skull
fractures or hemorrhages around the brain. Miller said the large bruise on Michael's forehead
could have been caused by someone holding Michael's head with his hand or by hitting his head
with a plastic ball, and the smaller bruises on the back of his head could have been caused by his
being "popped" or thumped on the head with a knuckle, ring, or other object. Miller said the
abrasions on and under Michael's chin and on his nose could have been caused by pinching. 
Miller found a healing injury on Michael's ear that could have been a healing bite mark; the bite
mark on Michael's thigh was caused by an adult. Miller also found puncture wounds on the
bottoms of Michael's feet that must have been caused by a sharp object such as a needle or a nail,
scratches on Michael's feet that could have been caused by a screw in the bassinet or by
someone's fingernails, injuries to Michael's fingers that could have been caused by a skin or
nutritional condition or by someone biting Michael's fingers, and bruises on Michael's heels. 
Miller also found a healing fracture on one of Michael's ribs that is "classically described as a
squeeze injury where an adult hand squeezes the body and breaks the rib." Miller examined
Michael's lungs and discovered evidence of repeated asphyxia events, consistent with someone
covering Michael's mouth and nose to the point that he gasped for air. The bleeding in Michael's
eye is consistent with his being smothered. Miller admitted he could not state with certainty that
Michael's injuries were caused by the behaviors attributed to appellant. Miller said that Michael
suffered most of his injuries some time before his death.

 Dr. David Hardy reviewed Michael's emergency room and autopsy records. Hardy
stated the rib fracture Miller found probably occurred seven to ten days before Michael's death. 
Hardy also found another fresh fracture that was not reported in Miller's autopsy. Hardy testified
the bruises to Michael's face were consistent with an adult hand hitting or squeezing Michael's
face. Hardy stated the bruises on Michael's forehead, heels, and shin were unusual because a
child of his age could not yet roll over, stand, or crawl. The traumas to Michael's fingers
indicated pressure or crush injuries. Hardy testified that there was an adult-sized bite mark on
Michael's leg, as well as a fading bite mark on his back. Hardy did not find any bite marks on
Michael's face, and he said the bite marks he did find were not consistent with those given by
children. Hardy testified that when someone has repeatedly placed his hand over a child's nose
and mouth and watched the child then gasp for air, that person would likely be aware of the
danger of suffocating the child. Hardy also found injuries consistent with Michael being slammed
against an object or an object being thrown against his head and injuries consistent with Michael's
fists being squeezed together hard enough and long enough to leave indentations from his fingers
on his palms. Both Miller and Hardy said that due to Michael's young age, it was unlikely that
his injuries were self-inflicted.


Sufficiency of the Evidence

 In his second and third issues on appeal, appellant argues the evidence is factually
and legally insufficient to support the jury's verdict that he was guilty of capital murder. In his
fourth issue, appellant contends the jury erred in not finding him guilty of the lesser included
offense of murder. His basic argument is that the evidence is insufficient to show he intended to
kill Michael, but instead shows only that he intended to quiet Michael's crying. We disagree.

 Appellant was indicted for capital murder under section 19.03(a)(8) of the penal
code, which provides that a person commits capital murder if he intentionally or knowingly causes
the death of an individual under six years of age. See Tex. Penal Code Ann. § 19.03(a)(8). A
person acts intentionally if his conscious objective or desire is to engage in or cause the result of
his conduct. See id. § 6.03(a). A person acts knowingly if he is aware of the nature of his
conduct or the surrounding circumstances and that his act is reasonably certain to cause the result. 
See id. § 6.03(b). Therefore, the evidence is sufficient if it shows appellant either (1) had the
conscious objective or desire to cause Michael's death or (2) was aware that it was reasonably
certain that his actions would cause Michael's death. The jury charge included a charge on the
lesser included offense of murder, authorizing the jury to convict appellant of murder if it found
he caused Michael's death in the course of committing or attempting to commit the felony of
injury to a child.


Legal Sufficiency

 In reviewing the legal sufficiency of the evidence, we view the evidence in the light
most favorable to the verdict and ask whether any rational trier of fact could have found the
elements of the crime beyond a reasonable doubt. See Rojas v. State, 986 S.W.2d 241, 246-47
(Tex. Crim. App. 1998); Wheeler v. State, 952 S.W.2d 603, 604 (Tex. App.--Austin 1997, pet.
ref'd). We review the entire record, the evidence, and all reasonable inferences therefrom, in
assessing the sufficiency of the evidence. See Teer v. State, 923 S.W.2d 11, 17 (Tex. Crim. App.
1996). Proof of intent generally relies on circumstantial evidence. See Steinbach v. State, 979
S.W.2d 836, 842 (Tex. App.--Austin 1998, pet. ref'd). Whether the circumstantial evidence
establishes the required level of intent or culpability is a question of fact for the jury. See
Maldonado v. State, 998 S.W.2d 239, 243 (Tex. Crim. App. 1999).

 When viewed in the light most favorable to the verdict, the evidence shows
appellant gave inconsistent statements to the police and child protective services, changing his
story to make Jessica responsible for having been the last person with Michael. Several witnesses
heard him call Michael obscene names and comment on Michael's being weak or a "sissy." 
Appellant had a history of verbally and physically abusing Michael, including laughing when
Michael cried and covering his nose and mouth and watching him gasp for air once he could
breathe again. Several doctors testified that Michael had suffered numerous serious injuries
during his short life. There was testimony that appellant's behavior on the night Michael died was
inconsistent with the witnesses's previous experience with parents grieving over losing a child. 
The evidence is sufficient for a rational trier of fact to reasonably find appellant either had the
conscious objective or desire to cause Michael's death or was aware that it was reasonably certain
that his actions would cause Michael's death. We overrule appellant's second issue on appeal.


Factual Sufficiency

 In reviewing the factual sufficiency of the evidence, we view all of the evidence
objectively and set aside a verdict only if it is so against the overwhelming weight of the evidence
as to be clearly wrong and unjust. See Rojas, 986 S.W.2d at 247; Reina v. State, 940 S.W.2d
770, 773 (Tex. App.--Austin 1997, pet. ref'd).

 Viewing all of the evidence in a neutral light, the jury heard testimony that Jessica
lied throughout the investigation and only accused appellant of abusing Michael at the trial. 
Munoz and Kelley admitted not reporting appellant's alleged abuse of Michael until after
Michael's death. Appellant appeared to be trying to revive Michael at the time the paramedics
arrived. There was testimony that appellant stated he did not intend to hurt Michael, but only to
quiet his crying. However, given the testimony about the extent of the injuries suffered by
Michael in the time leading up to his death, appellant's on-going abuse and apparent disregard for
Michael's well-being, and the evidence that appellant was aware that covering Michael's face
caused Michael not to be able to breathe, the verdict is not so against the overwhelming weight
of the evidence as to be clearly wrong and unjust. Appellant has not shown the jury erred in
refusing to find him guilty only of the lesser included offense of murder. We hold the evidence
is factually sufficient to support the verdict and we overrule appellant's third and fourth issues on
appeal.


Testimony of Extraneous Bad Acts

 The State presented testimony about Michael's injuries, appellant's past abusive
behavior toward Michael, and appellant's behavior on the night Michael died. Appellant objected
to testimony that referred to earlier instances of abuse. Each time his objection was overruled,
the district court instructed the jury that it could not consider the evidence of other acts of abuse
unless it was satisfied beyond a reasonable doubt that appellant committed those acts, and then it
could only consider those acts for the purpose of determining intent, knowledge, or lack of
accident or mistake.

 Appellant contends the district court erred in allowing testimony of earlier instances
of his abusive behavior. He argues the State did not prove beyond a reasonable doubt that
appellant committed the alleged extraneous bad acts, the alleged acts were irrelevant to the charges
appellant faced, and the evidence of the extraneous bad acts was unfairly prejudicial. We
disagree.

 A trial court's decision to admit or exclude evidence is reviewed under an abuse
of discretion standard. See Hernandez v. State, 973 S.W.2d 787, 789 (Tex. App.--Austin 1998,
pet. ref'd). Relevant evidence is admissible unless otherwise provided by Constitution, statute,
or rule. See Tex. R. Evid. 402; Montgomery v. State, 810 S.W.2d 372, 386 (Tex. Crim. App.
1990) (op. on reh'g) (discussing former Rules of Criminal Evidence, recodified in 1997 as Rules
of Evidence). Evidence is relevant if it has "any tendency to make the existence of any fact that
is of consequence to the determination of the action more probable or less probable than it would
be without the evidence." Tex. R. Evid. 401; Montgomery, 810 S.W.2d at 386.

 Evidence of extraneous bad acts is inadmissible to show the defendant acted in
conformity therewith. See Tex. R. Evid. 404(b); Montgomery, 810 S.W.2d at 387; Blakeney v.
State, 911 S.W.2d 508, 514 (Tex. App.--Austin 1995, no pet.). However, evidence of extraneous
offenses may be admitted for certain permissible purposes, apart from its tendency to show the
defendant's general criminal propensities. See Owens v. State, 827 S.W.2d 911, 914 (Tex. Crim.
App. 1992); Montgomery, 810 S.W.2d at 387; Zuliani v. State, 903 S.W.2d 812, 826 (Tex.
App.--Austin 1995, pet. ref'd). Permissible purposes under rule 404(b) include showing the
defendant's motive, opportunity, intent, knowledge, or absence of mistake or accident. See Tex.
R. Evid. 404(b); Montgomery, 810 S.W.2d at 387. If a defendant objects to the admission of such
evidence, the trial court must determine whether a jury could reasonably find beyond a reasonable
doubt that the defendant committed the extraneous offenses. See Harrell v. State, 884 S.W.2d
154, 160 (Tex. Crim. App. 1994); Gonzales v. State, 929 S.W.2d 546, 550 (Tex. App.--Austin
1996, pet. ref'd). It is for the jury, as the trier of fact, to determine whether the State showed
beyond a reasonable doubt that the defendant committed the extraneous bad acts. See Mitchell v.
State, 931 S.W.2d 950, 954 (Tex. Crim. App. 1996). In other words, evidence of extraneous bad
acts may be admissible if (1) it is relevant under rule 401 and (2) it falls within an exception under
rule 404(b). See Rogers v. State, 853 S.W.2d 29, 32 (Tex. Crim. App. 1993); Garrett v. State,
875 S.W.2d 444, 446 (Tex. App.--Austin 1994, pet. ref'd).

 Once the trial court determines the evidence of extraneous bad acts is relevant for
a purpose other than to show the defendant's general criminal character and upon a further
objection under rule 403, the trial court must then evaluate whether the probative value of the
evidence is substantially outweighed by the danger of unfair prejudice to the defendant. See Tex.
R. Evid. 403; Montgomery, 810 S.W.2d at 389; Prieto v. State, 879 S.W.2d 295, 297 (Tex.
App.--Houston [14th Dist.] 1994, pet. ref'd). If the trial court determines the evidence should be
admitted and the defendant so requests, the court must instruct the jury not to consider the
extraneous offense evidence, which is only admitted for a limited purpose, unless it believes
beyond a reasonable doubt that the defendant committed the extraneous offense. See George v.
State, 890 S.W.2d 73, 76 (Tex. Crim. App. 1994). The jury, as trier of fact, is the exclusive
judge of the facts and of the weight and credibility to be given to each witness's testimony, and
we will not second guess its determination. See Tex. Code Crim. P. Ann. art. 38.04 (West 1979);
Williams v. State, 692 S.W.2d 671, 676 (Tex. Crim. App. 1984); Skillern v. State, 890 S.W.2d
849, 879 (Tex. App.--Austin 1994, pet. ref'd). 

 Appellant contends the extraneous-offense evidence was irrelevant because
"[b]iting, pinching, and throwing balls is not tantamount to smothering a child" and because the
alleged bad acts were different in character and remote in time to the acts that allegedly caused
Michael's death. However, preceding acts of abuse have been held to be relevant and admissible
in other cases involving injury or death to a child. See Marx v. State, 953 S.W.2d 321, 336-37
(Tex. App.--Austin 1997), aff'd, 987 S.W.2d 557 (Tex. Crim. App. 1999) (confession of other
instances of sexual abuse relevant to show defendant's motive and knowledge); Stiles v. State, 927
S.W.2d 723, 732 (Tex. App.--Waco 1996, no pet.) (evidence of investigation into abuse of another
child relevant; tended to make more probable the conclusion that defendant intentionally or
knowingly hurt victim); Hernandez v. State, 914 S.W.2d 226, 233 (Tex. App.--Waco 1996, no
pet.) (testimony that defendant punched victim on other occasions relevant to show conscious
objective or desire to hurt victim and to rebut claims of accident or mistake); Prieto, 879 S.W.2d
at 298 (evidence of defendant's past abuse of victim relevant; makes criminal intent to injure
victim more likely and makes lawful intent less likely). Cf. Owens, 827 S.W.2d at 916 (alleged
pattern of abuse not relevant absent any rule 404(b) issues); Zuliani, 903 S.W.2d at 827 (evidence
of abusive behavior in adult relationship irrelevant in trial for injury to two-year old child).

 Appellant's past abuse of Michael, in particular the fact that he would cover
Michael's nose and mouth with his hand or a pillow and then watch him gasp for breath, is
relevant to show Michael's death was not the result of accident or mistake and to show appellant's
knowledge and intent that his behavior would harm Michael. The district court did not err in
finding the testimony of appellant's past abuse was relevant to show elements other than
appellant's general bad character.

 Appellant contends the State did not prove beyond a reasonable doubt that he
committed the extraneous bad acts. He argues that "[a]ll the trier of fact had was testimony from
incoherent and unbelievable witnesses," and that there was a total lack of physical evidence tying
him to the alleged bad acts. The district court did not abuse his discretion in finding that a jury
could reasonably find beyond a reasonable doubt that appellant committed the alleged bad acts. 
Therefore, the district court properly allowed the testimony to be admitted for the jury's
evaluation. Four witnesses testified to the abuse they saw appellant inflict on Michael. The four
witnesses all described similar abusive behaviors. The jury heard testimony that could have
reflected poorly on Jessica's and Kelley's credibility, and it was for the jury to decide the weight
to give their testimony. We will not disturb the jury's decision.

 Appellant further argues the extraneous-bad-acts evidence was unfairly prejudicial
because the jury could not have dispassionately weighed the evidence once it heard the testimony
of earlier abusive episodes. Instead, he argues, it could only have viewed him as a person with
bad character, and it convicted him on that basis. Relevant evidence should only be excluded
from evidence if its prejudicial effect substantially outweighs its probative value. See
Montgomery, 810 S.W.2d at 389. We will not disturb a trial court's ruling on the admissibility
of evidence unless we find a clear abuse of discretion, that is, the court's decision "falls outside
the zone of reasonable disagreement." Jones v. State, 944 S.W.2d 642, 651 (Tex. Crim. App.
1996); see Poole v. State, 974 S.W.2d 892, 897 (Tex. App.--Austin 1998, no pet.). Appellant has
not demonstrated that the district court clearly abused his discretion in finding that probative value
of the testimony of extraneous bad acts was not substantially outweighed by any prejudicial effect. 
We overrule appellant's first issue.


Conclusion

 Having overruled appellant's four issues on appeal, we affirm the district court's
judgment of conviction for capital murder.



 
 

 Lee Yeakel, Justice

Before Justices Jones, Yeakel and Patterson

Affirmed 

Filed: August 10, 2000

Do Not Publish



de Crim. P. Ann. art. 38.04 (West 1979);
Williams v. State, 692 S.W.2d 671, 676 (Tex. Crim. App. 1984); Skillern v. State, 890 S.W.2d
849, 879 (Tex. App.--Austin 1994, pet. ref'd). 

 Appellant contends the extraneous-offense evidence was irrelevant because
"[b]iting, pinching, and throwing balls is not tantamount to smothering a child" and because the
alleged bad acts were different in character and remote in time to the acts that allegedly caused
Michael's death. However, preceding acts of abuse have been held to be relevant and admissible
in other cases involving injury or death to a child. See Marx v. State, 953 S.W.2d 321, 336-37
(Tex. App.--Austin 1997), aff'd, 987 S.W.2d 557 (Tex. Crim. App. 1999) (confession of other
instances of sexual abuse relevant to show defendant's motive and knowledge); Stiles v. State, 927
S.W.2d 723, 732 (Tex. App.--Waco 1996, no pet.) (evidence of investigation into abuse of another
child relevant; tended to make more probable the conclusion that defendant intentionally or
knowingly hurt victim); Hernandez v. State, 914 S.W.2d 226, 233 (Tex. App.--Waco 1996, no
pet.) (testimony that defendant punched victim on other occasions relevant to show conscious
objective or desire to hurt victim and to rebut claims of accident or mistake); Prieto, 879 S.W.2d
at 298 (evidence of defendant's past abuse of victim relevant; makes criminal intent to injure
victim more likely and makes lawful intent less likely). Cf. Owens, 827 S.W.2d at 916 (alleged
pattern of abuse not relevant absent any rule 404(b) issues); Zuliani, 903 S.W.2d at 827 (evidence
of abusive behavior in adult relationship irrelevant in trial for injury to two-year old child).

 Appellant's past abuse of Michael, in particular the fact that he would cover
Michael's nose and mouth with his hand or a pillow and then watch him gasp for breath, is
relevant to show Michael's death was not the result of accident or mistake and to show appellant's
knowledge and intent that his behavior would harm Michael. The district court did not err in
finding the testimony of appellant's past abuse was relevant to show elements other than
appellant's general bad character.

 Appellant contends the State did not prove beyond a reasonable doubt that he
committed the extraneous bad acts. He argues that "[a]ll the trier of fact had was testimony from
incoherent and unbelievable witnesses," and that there was a total lack of physical evidence tying
him to the alleged bad acts. The district court did not abuse his discretion in finding that a jury
could reasonably find beyond a reasonable doubt that appellant committed the alleged bad acts. 
Therefore, the district court properly allowed the testimony to be admitted for the jury's
evaluation. Four witnesses testified to the abuse they saw appellant inflict on Michael. The four
witnesses all described similar abusive behaviors. The jury heard testimony that could have
reflected poorly on Jessica's and Kelley's credibility, and it was for the jury to decide the weight
to give their testimony. We will not disturb the jury's decision.

 Appellant further argues the extraneous-bad-acts evidence was unfairly prejudicial
because the jury could not have dispassionately weighed the evidence once it heard the testimony
of earlier abusive episodes. Instead, he argues, it could only have viewed him as a person with
bad character, and it convicted him on that basis. Relevant evidence should only be excluded
from evidence if its prejudicial effect substantially outweighs its probative value. See
Montgomery, 810 S.W.2d at 389. We will not disturb a trial court's ruling on the admissibility
of evidence unless we find a clear abuse of discretion, that is, the court's decision "falls outside
the zone of reasonable disagreement." Jones v. State, 944 S.W.2d 642, 651 (Tex. Crim. App.
1996); see Poole v. State, 974 S.W.2d 892, 897 (Tex. App.--Austin 1998, no pet.). Appellant has
not demonstrated that the district court clearly abused his discretion in finding that probative value
of the testimony of extraneous bad acts was not substantially outweighed by any prejudicial effect. 
We overrule appellant's first issue.